John J. LEONARD, Appellee,

v.

STATE of Iowa and the Mental Health Institute at Independence, Iowa, Appellants.

No. 91–270.

Supreme Court of Iowa.

Sept. 23, 1992.

Bonnie J. Campbell, Atty. Gen., and Dean A. Lerner, Asst. Atty. Gen., for appellants.

Hugh G. Albrecht, Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

Plaintiff John Leonard was seriously injured in an assault by Henry Parrish, a recently discharged patient at defendant Mental Health Institute at Independence, Iowa (hereinafter "MHI"). The question on appeal is whether MHI's treatment of Parrish, or its decision to discharge him, gives rise to a duty of care towards Leonard that would sustain a cause of action based on negligence or medical malpractice. We hold that under the facts of this

case the defendants owed no duty to Leonard for their conduct. Accordingly, we reverse a contrary decision by the district court on summary judgment and remand for dismissal of plaintiff's petition.

### I. *Scope of Review.*

This case reaches us on MHI's interlocutory appeal from the district court's denial of its motion for summary judgment. The district court concluded that the scope of MHI's duty to Leonard, if any, could not be determined on the record made.

■■ It is true that actions for negligence ordinarily do not lend themselves to resolution by summary judgment. *Daboll v. Hoden*, 222 N.W.2d 727, 734 (Iowa 1974). But essential to any claim of negligence is the existence of a duty owed by the defendant to the plaintiff. *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 285 (Iowa 1981). "[A]ctionable duty is defined by the relationship between individuals; it is a legal obligation imposed upon one individual for the benefit of another person or particularized class of persons." *Sankey v. Richenberger*, 456 N.W.2d 206, 209 (Iowa 1990). Whether, under a given set of facts, such a duty exists is a question of law. *Anthony v. State*, 374 N.W.2d 662, 668 (Iowa 1985).

■■ As we view the record before us in the light most favorable to the plaintiff, we are convinced that the material facts underlying Leonard's claim of duty are not disputed. Thus resolution of the controversy by summary judgment is proper. *See Hoefer v. Wisconsin Educ. Ass'n Ins. Trust*, 470 N.W.2d 336, 339 (Iowa 1991) (court concerns itself on summary judgment with only those facts materially affecting narrow issue posed); *Sankey*, 456 N.W.2d at 207 (summary judgment proper where only issue is legal consequences flowing from undisputed facts). Our review is for the correction of errors at law. *Sankey*, 456 N.W.2d at 207.

### II. *Background Facts and Proceedings.*

On March 30, 1987, Henry Parrish became a patient at MHI following transfer from a Cedar Rapids hospital where he had been involuntarily committed at the request of his mother. His diagnosis upon admission at MHI was bipolar affective disorder, manic type, with alcohol dependency and suicidal ideation. He was placed on special assault and suicide precautions. The assault precautions were discontinued the following day, and the suicide precautions were suspended three days after his admission.

Parrish began Lithium therapy for his bipolar disorder. Over the next two weeks his condition improved sufficiently to warrant a home leave from April 14 to 17. On April 17 he called the hospital requesting an extension of the leave to complete some personal business. Because he sounded rational and logical on the telephone, his leave was extended. Arrangements were made for Parrish to secure a prescription for additional medication at a local pharmacy.

Upon Parrish's return to MHI on April 20, he smelled of alcohol. He acknowledged having drunk three beers. The parties dispute the extent of Parrish's cooperation with his treatment plan during the remainder of his hospital stay. MHI's chief medical officer, Dr. V.J. Modha, reported that Parrish was cooperative and friendly with staff, took his medication willingly, showed progress in socialization, and exhibited no clinical evidence of psychosis or major depression. Leonard tendered a contrary opinion from a clinical psychologist hired by him to review Parrish's medical records for trial. This psychologist stated by affidavit that Parrish was sarcastic and flippant upon his return from leave, and demanding in regard to his discharge. The affiant cited Parrish's failure to refrain from alcohol use, and another incident in which he attempted to sneak golf clubs into the unit without permission, as proof that Parrish was not as compliant with his treatment regimen as Dr. Modha's report would suggest.

In any event, MHI staff determined on April 23, 1987, that Parrish was in fair remission and had reached "maximum inpa-

tient psychiatric benefits." He was then discharged from MHI with the recommendation that his commitment be continued on an outpatient basis at the Mental Health Center in Cedar Rapids. Dates were scheduled for appointments with a psychiatrist and a substance abuse counselor.

In the meantime, Parrish returned to his work as a demolition contractor. He hired plaintiff John Leonard to work for him. On May 6, instead of working, the two spent the day drinking. They ended up at Parrish's house. Late that evening, apparently without provocation, Parrish beat Leonard severely about the head and body, locked him in his house, and left him unconscious. Parrish was subsequently convicted of kidnapping and attempted murder.

Leonard then sued the state and MHI for the injuries he sustained. His petition claimed that the defendants failed to provide Parrish with proper care and treatment and that they subsequently discharged him knowing that he posed a threat to those with whom he might come in contact. He rested his claims on theories of negligence, breach of implied and express warranty, breach of the standard of care, and breach of contract.

Defendants' answer asserted that plaintiff failed to state a cause of action cognizable at law and, further, that if such a cause of action were recognized, defendants would be entitled to immunity under the discretionary function exception of the Iowa Tort Claims Act, Iowa Code section 25A.14(1) (1989).

In resistance to defendants' subsequent motion for summary judgment, Leonard enlarged the facts described above by tendering proof of Parrish's prior history of mental commitments and criminal activity. That record revealed several prior involuntary commitments with similar admitting diagnoses, and a list of numerous criminal charges for assault, trespass, criminal mischief, and public intoxication.

The district court ruled that the special relationship between Parrish and his state psychiatrist could give rise to a duty towards Leonard, but that summary judgment was precluded because the extent of that duty could not be determined without "a careful weighing of various factors in the evidentiary context of the case at hand." (Citing *Perreira v. Colorado*, 768 P.2d 1198, 1214 (Colo.1989)). Likewise the court ruled that any breach of the state's duty of care toward Parrish posed factual issues which could not be summarily adjudicated. The court also found the discretionary function exception inapplicable to a state psychiatrist's decision to discharge an involuntarily committed mental patient. It did, however, dismiss plaintiff's claims for breach of warranty and contract. No appeal from the dismissal of the latter two claims has been taken.

On appeal the State challenges the court's rulings concerning its duty toward Leonard. We note as a preliminary matter that as far as the question of duty is concerned, no meaningful distinction can be made between Leonard's claim of negligence and his claim for breach of the standard of care, or malpractice. Both claims stem from his assertion that state physicians at MHI negligently treated and discharged Parrish, all to Leonard's injury. Thus for purposes of appeal, we treat the two claims as one.

The State also contests the court's refusal to grant the State immunity under Iowa Code section 25A.14(1) for breach of any duty that might exist. Because we are convinced that the absence of duty dooms Leonard's cause of action, we need not address the immunity issue. *See Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990) (Tort Claims Act creates no new causes of action but merely recognizes and provides remedy for those already existing).

III. *Duty.*

This court has not previously considered whether a psychiatrist has a duty to protect persons injured by a patient who is, or has been, under the doctor's care. It is the general rule, of course, that a person has no duty to control the conduct of another. Restatement (Second) of Torts § 315 (1965). The rule is qualified, however, where the following exceptions apply:

(a) a special relation exists between the actor [psychiatrist] and the third person [patient] which imposes a duty upon the actor [psychiatrist] to control the third person's [patient's] conduct, or

(b) a special relation exists between the actor [psychiatrist] and the other [victim] which gives to the other [victim] a right to protection.

*Id.* The commentary to the rule notes that subparagraph (a), which pertains to the case before us, is also governed by section 319, which provides:

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

Restatement (Second) of Torts § 319. The illustrations given in support of section 319 cite the liability of a hospital to a person infected by a diseased patient who is negligently released, and the liability of an insane asylum for injury caused by the negligent release of a homicidal maniac. Restatement (Second) of Torts § 319 cmt. a, illus. 1, 2.

■ There can be little doubt that a special relationship existed between Parrish and his treating physician at MHI. His continuing involuntary commitment only serves to reinforce that bond. Therefore MHI had a duty to control Parrish's conduct, or at least not negligently release him from custody. But the Restatement rules cited above do not answer the precise question before us: Does the duty to refrain from negligently releasing dangerous persons from custody run from the custodian to the public at large or only to the reasonably foreseeable victims of the patient's dangerous tendencies?

■ Courts in other states that have faced the issue of psychiatric liability for discharge of mental patients vary widely with respect to the universe of persons to which they will hold the doctor answerable. A number of courts seem to hold that a psychiatrist's duty of care runs to the public at large. *Perreira*, 768 P.2d at 1201;

*Naidu v. Laird*, 539 A.2d 1064, 1073 (Del. 1988); *Estate of Johnson v. Village of Libertyville*, 146 Ill.App.3d 834, 839, 100 Ill.Dec. 154, 158, 496 N.E.2d 1219, 1223 (1986); *Durflinger v. Artiles*, 234 Kan. 484, 492, 499, 673 P.2d 86, 94, 99 (1983). Others narrow the doctor's duty to that class of reasonably foreseeable victims of the patient's dangerous propensities. *Jablonski v. United States*, 712 F.2d 391, 398 (9th Cir.1983); *Lipari v. Sears, Roebuck & Co.*, 497 F.Supp. 185, 194 (D.Neb.1980); *Hamman v. County of Maricopa*, 161 Ariz. 58, 64, 775 P.2d 1122, 1128 (1988); *Petersen v. State*, 100 Wash.2d 421, 428, 671 P.2d 230, 237 (1983). Still others impose upon the doctor a duty to protect only potential victims identified by the patient. *Furr v. Spring Grove State Hosp.*, 53 Md. App. 474, 489, 454 A.2d 414, 421 (1983); *McIntosh v. Milano*, 168 N.J.Super. 466, 489, 403 A.2d 500, 511–12 (1979). Finally, at least one jurisdiction has soundly rejected a psychiatrist's duty of care to the public at large, without voicing an opinion about a duty to those occupying the middle ground. *Sherrill v. Wilson*, 653 S.W.2d 661, 667 (Mo.1983).

We are able to narrow our inquiry to the psychiatrist's duty to members of the general public because Leonard can claim no other status. He was unacquainted with Parrish prior to Parrish's commitment or discharge. No threats against him were ever voiced by Parrish to his attending physician. Nor is there any evidence in the summary judgment record from which a reasonable person could find that Leonard belonged to a class of persons more endangered by Parrish's release than the public at large.

In analogous cases in Iowa, this court has viewed the duties described in Restatement sections 315 and 319 quite narrowly, guided by the principle that the scope of the duty turns on the foreseeability of harm to the injured person. *See, e.g., Sankey*, 456 N.W.2d at 209–10 (neither city ordinance nor common law imposed duty upon police chief to protect city officials from shooting spree in city council chambers); *Fitzpatrick v. State*, 439 N.W.2d

663, 667–68 (Iowa 1989) (parole officer had no legal duty to police officer injured by parolee); *M.H. By and Through Callahan v. State*, 385 N.W.2d 533, 536 (Iowa 1986) (state's duty to care for its citizens does not create cause of action against social workers for negligent failure to remove child from abusive parent); *Rittscher v. State*, 352 N.W.2d 247, 251 (Iowa 1984) (same).

The foregoing cases also reflect strong public policy concerns about the potential for limitless liability when an individual's decision might affect the general public. In the context of a psychiatrist's decision to release an involuntary mental patient, these same public policy considerations apply. We believe that the risks to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions. The Missouri Supreme Court described the consequences this way:

> The treating physicians, in their evaluation of the case, well might believe that [the patient] could be allowed to leave the institution for a prescribed period and that his release on pass might contribute to his treatment and recovery. We do not believe that they should have to function under the threat of civil liability to members of the general public when making decisions about passes and releases. The plaintiff could undoubtedly find qualified psychiatrists who would testify that the treating physicians exercised negligent judgment, especially when they are fortified by hindsight. The effect would be fairly predictable. The treating physicians would indulge every presumption in favor of further restraint, out of fear of being sued. Such a climate is not in the public interest.

*Sherrill*, 653 S.W.2d at 664.

■ This balancing of interests in favor of nonliability recognizes the statutory framework within which these professionals must operate. As this court recently noted in another case, decisions in the realm of mental commitment rest not only on medical judgments but on societal judgments about a community's tolerance for the sometimes deviant behavior of mentally ill persons. *B.A.A. v. University of Iowa Hosp.*, 421 N.W.2d 118, 122 (Iowa 1988). It is not only the customary procedure, but the constitutionally and statutorily mandated requirement, to treat even seriously mentally impaired persons in the least restrictive environment medically possible. *Id.* at 124; *see* Iowa Code § 229.14(3) (authorizing outpatient treatment for persons still seriously mentally impaired but not requiring full-time hospitalization); 441 Iowa Admin.Code 28.4(6) (giving patient right to least restrictive conditions necessary to achieve treatment objectives). Such a decision necessarily requires the psychiatrist to forecast the patient's likely behavior toward others upon release. We are convinced that if that prognosis were subject to second-guessing by any member of the public who might later be injured by the patient, it could severely chill the physician's capacity for decision making and ultimately threaten the integrity of our civil commitment system.

We need not decide what duty, if any, would attach to the discharge decision if the psychiatrist had reason to believe some particular person would be endangered by the patient's release. Facts that might alter our view of the physician's duty under such circumstances simply do not present themselves here. We merely hold that a psychiatrist owes no duty of care to an individual member of the general public for decisions regarding the treatment and release of mentally ill persons from confinement.

We reverse the district court's ruling on summary judgment and remand for dismissal of plaintiff's petition.

REVERSED AND REMANDED WITH INSTRUCTIONS.