*Kuligoski v. Brattleboro Retreat*, No. 47-2-14 Wmcv (Wesley, J., Sep. 28, 2014).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                      CIVIL DIVISION
Windham Unit                                        Docket No. 47-2-14 Wmcv

Kuligoski et al vs. Brattleboro Retreat et al

## ENTRY REGARDING MOTION

Title:          Motion to Dismiss as to Brattleboro Retreat ONL (Motion 1)
Filer:          Brattleboro Retreat
Attorney:       Ritchie E. Berger
Filed Date:     April 3, 2014

Response filed on 04/22/2014 by Attorney Richard T. Cassidy for Plaintiff James Kuligoski
Response filed on 05/08/2014 by Attorney Ritchie E. Berger for Defendant Brattleboro Retreat

Title:          Motion to Dismiss (Motion 2)
Filer:          Northeast Kingdom Human Services
Attorney:       Stephen J. Soule
Filed Date:     April 11, 2014

Response filed on 04/29/2014 by Attorney Richard T. Cassidy for Plaintiff James Kuligoski
Response filed on 05/15/2014 by Attorney Stephen J. Soule for Defendant Northeast Kingdom Human Services
Response filed on 05/19/2014 by Attorney Stephen J. Soule for Defendant Northeast Kingdom Human Services

**The motions are GRANTED.**

### Opinion & Order
### Granting Each Defendant's Motion to Dismiss

### Factual Background

Plaintiffs sue Defendants for negligent mental health treatment of E.R., and for failure to warn as to the likelihood that E.R. posed a danger due to his untreated condition. After being discharged from care at the Brattleboro Retreat, and while under out-patient treatment by staff at Northeast Kingdom Human Services, E.R. assaulted Plaintiff Michael Kuligoski. Kuligoski was severely and permanently injured, and will require ongoing medical attention and supportive assistance for the rest of his life. E.R. suffers from schizophreniform disorder and had wandered

away from his family when he encountered Kuligoski, whom he did not know. E.R. hit Kuligoski with a pipe wrench, strangled and attempted to drown him.

Plaintiffs' suit against the Brattleboro Retreat and Northeast Kingdom Human Services challenges their treatment of E.R. Plaintiffs sue the Brattleboro Retreat for negligent discharge (Count I), failure to warn (Count II), failure to train (Count III), and negligent undertaking (Count IV). Plaintiffs sue Northeast Kingdom for failure to warn (Count V), failure to treat (Count VI), and negligent undertaking (Count VII). Plaintiffs have filed a separate suit against E.R. and his family in Caledonia County, which is in the early stage of pre-trial development.

According to the complaint, the Central Vermont Medical Center admitted E.R. on October 9, 2010. At the time of admission, or shortly thereafter, E.R. threatened a mental health worker, made threatening statements about assaulting his sister's boyfriend, reported auditory hallucinations, and was noted to be easily agitated with fair-to-poor insight. On October 12, 2010, a physician tentatively diagnosed E.R. with schizophreniform disorder.[1] On October 15, 2010, CVMC completed paperwork for involuntary commitment, stating that E.R. was mentally ill and posed a danger to himself or others. After assaultive behavior toward staff, and further threatening and homicidal ideation expressed to his physician, E.R. was placed in five-point restraints and transferred on October 16, 2010 from CVMC to the Vermont State Hospital. The admitting physician at VSH concluded that he was clearly a danger to others, including members of his family. While at VSH, E.R. was administered anti-psychotic and anti-anxiety medications. That same day, VSH transferred E.R. to the Brattleboro Retreat.

E.R. remained a patient at the Brattleboro Retreat from October 16, 2010 until November 12, 2010.[2] The Retreat determined E.R. likely suffered from schizophreniform disorder and noted E.R. indicated homicidal and suicidal tendencies. E.R. expressed a desire to harm staff. He threw a telephone, acted in menacing fashion, and was reported to be grossly psychotic and lacking insight or judgment over the course of most of his stay at the Retreat. The Retreat also noted E.R. was at risk for not taking his medications if discharged. E.R.'s treating physician, Dr. Rowland, noted gradual improvement, but also continued to make notations in E.R.'s chart that he was at high risk of decompensation if discharged. The Retreat designed an aftercare treatment plan for E.R. in early November, and discussed the plan with E.R.'s parents. The plan contemplated outpatient care for E.R. by Northeast Kingdom Human Services. On the day of E.R.'s discharge, November 12, E.R. acknowledged hearing voices commanding him to "do this, do that". He said the most extreme thing the voices told him to do was "to kill

---

[1] Schizophreniform disorder is similar to schizophrenia but considered a less severe disorder . *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 290 (4th ed. 1994). Diagnosis for schizophreniform disorder requires the patient to suffer from hallucinations for at least one month, but less than six months. *See id.* Additionally, the schizophreniform patients may lack impairment for social or occupational functions. *See id.*

[2] The complaint is not explicit whether E.R. remained at the Retreat voluntarily, or under the compulsion of the initial application for emergency examination provided for by 18 V.S.A. § 7504, in which case proceedings for involuntary treatment would have been commenced as provided in § 7612, after the emergency examination required by § 7508. By their memorandum in opposition, Plaintiffs relate that subsequent investigation discloses that a petition for E.R.s involuntary treatment was dismissed on Dec. 7, 2010. As discussed below, the distinction between voluntary and involuntary treatment has little effect on the analysis of each Defendant's duty; even assuming E.R. was initially admitted to the Retreat as an involuntary patient for emergency examination, and remained an involuntary patient until his discharge, neither Defendant was under any legal duty with respect to anticipating and preventing the injuries suffered by Plaintiff.

myself."[3] In a progress note on that day, Dr. Rowland acknowledged that E.R. had refused medications which seemed to lead to an increase in his hearing voices. Dr. Rowland's discharge summary referenced the belief by E.R.'s parents that his psychotic disorder was related to having broken up with his girlfriend in 2009, or perhaps related to a prior episode of mononucleosis which might explain some of his symptoms. Upon his discharge from the Retreat, E.R. was prescribed medications to be taken on a daily basis, although the Retreat understood that patients with psychotic disorders sometimes resist taking medication.

On December 1, 2010, after his discharge from the Retreat, E.R. met with representatives of NKHS to discuss his treatment plan. After completing his assessment, a member of E.R.'s treatment team from NKHS found him to be at high risk for emotional, behavioral, or cognitive complications due to the recent diagnosis of a psychotic disorder, about which E.R. had minimal insight. In mid-December, E.R. told his mother he had stopped taking his medications. E.R.'s mother called NKHS to give notice that E.R. had stopped taking his medications. NKHS did not take any action to attempt contact with E.R., indicating instead that E.R. must decide whether to take care of himself, including what mental health treatment he was willing to accept. E.R. had no contact with anyone from NKHS between mid-December 2010 and March 2011.

On February 26, 2011, E.R.'s father took E.R. to an apartment building in St. Johnsbury. Plaintiff Michael Kuligoski was at the apartment building to work on a furnace. E.R. wandered away from his father and assaulted Kuligoski, causing the injuries that are the subject of this suit.

## Procedural History

On April 3, 2014, the Brattleboro Retreat moved to dismiss for lack of duty, and lack of proximate cause, based on the facts stated in the complaint. On April 11, 2014, Northeast Kingdom moved to dismiss on the same basis. On April 22, 2014, Plaintiffs opposed the Brattleboro Retreat's motion to dismiss. On April 29, 2014, Plaintiffs opposed Northeast Kingdom's motion to dismiss. On May 8, 2014, the Brattleboro Retreat responded to the opposition. On May 15, 2014, Northeast Kingdom responded to opposition. On May 12, 2014, Plaintiffs requested oral argument on the motions to dismiss.

The Court held a hearing on the motions to dismiss on August 26, 2014. Attorney Richard Cassidy represented Plaintiff. Attorney Ritchie Berger represented the Brattleboro Retreat. Attorney Stephen Soule represented the Northeast Kingdom. The Court heard oral arguments on the motions, and took the matter under advisement.

---

[3] By their reply memorandum, the Retreat vigorously disputes the accuracy of the complaint in this regard, representing that full resort to the medical record would demonstrate that E.R. was describing an incident that happened six weeks previously, and that he disclaimed any present sense of compulsion with respect to the "voices", or any intention to harm himself or others. For purposes of this opinion, the Court must accept the allegations in the complaint as true, nonetheless. *Richards v. Town of Norwich*, 169 Vt. 44, 48-49 (1999).

## Standard of Review

The Court disfavors and rarely grants motions to dismiss. *See Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575. The Court uses motions to dismiss to evaluate the law in a pleading. *Powers v. Office of Child Support*, 173 Vt. 390, 395 (2002). Accordingly, the Court will only grant a motion to dismiss when there are "no facts or circumstances, consistent with the complaint that would entitle Plaintiff to relief." *Bock*, 2008 VT 81, ¶ 4.

## Discussion

*Duty to Warn/ Duty to Train*

The Vermont Supreme Court clarified the duty to warn arising from mental health treatment in *Peck v. Counseling Service of Addison County, Inc.*, 146 Vt. 61, 66–67 (1985). In *Peck*, the parents of a patient sued a counseling service for negligence. *Id.* at 63. The patient expressed a desire to harm his father by burning down his father's barn. *Id.* at 63–64. The therapist did not warn the patient's parents of the threat and one week later the patient burned down the barn. *Id.* The parents brought suit for failure to warn. *Id.* at 64.

The Supreme Court determined mental health professionals have a duty to warn where a patient makes a threat against an identifiable victim. *Id.* at 66–67. The Court first noted, there is generally no duty to control the conduct of another person to prevent harm to a third party. *Id.* at 64–65 (citing Restatement (Second) of Torts § 315). However, a therapist has a special relationship with a patient that requires the therapist to exercise reasonable care to prevent harm to third parties. *Id.* at 65 (quoting *Tarasoff v. Regents of the Univ. of Cal.*, 551 P.2d 334, 343 (Cal. 1976)). The Supreme Court extended *Tarasoff's* reasoning to hold:

> Once a therapist determines, or, based on the standards of the mental health professional community, should have determined that his or her patient poses a serious risk of danger to another, then he or she has the duty to take whatever steps are reasonably necessary to protect the foreseeable victim of that danger.

*Id.* at 66–67. Significantly, because the patient had made specific threats to harm identified persons, the Court found it reasonable and necessary that the therapist should take measures to warn the parents under those circumstances, notwithstanding the expectation of confidentiality associated with the therapist-patient relationship. *See id.* at 67.

> Thus, we hold that a mental health professional who knows or, based upon the standards of the mental health profession, should know that his or her patient *poses a serious risk of danger to an identifiable victim*, has a duty to exercise reasonable care to protect him or her from that danger.

*See id.* at 68 (emphasis supplied).

Cases interpreting *Peck* have emphasized that the duty to warn arises only when triggered by risk of danger to an identifiable victim. *See Barrett v. Prison Health Servs., Inc.*, No. 5:08-CV-203, 2010 WL 2837010 (D. Vt. July 19, 2010)(Reiss, J.); *Baker v. Univ. of Vt.*, No. 233-10-

4

03 Oscv, 2005 WL 6280644 (Vt. Super. Ct. May 4, 2005) (Morris, J.); *see also* George A. Michak, *Developments in Vermont Law: Standard of Care, Duty, and Causation in Failure to Warn Actions against Mental Health Professionals*, 11 Vt. L. Rev. 343, 350–51 (1986) (discussing ambiguities left by *Peck*). In *Barrett*, a correctional officer sued the company responsible for prison health care for failing to warn or protect against an attack from a mentally ill inmate. *See* 2010 WL 2837010 at *1–2, *5. Judge Reiss interpreted *Peck* as holding that a mental health professional must know of threats against an identifiable victim to trigger the duty to warn. *Id.* at *8. The court also observed that its reading of *Peck* to require an identifiable victim was consistent with the law in other jurisdictions. *Id.* Judge Morris came to a similar conclusion. *See Baker*, 2005 WL 6280644 fn. 8 ("It is logical and reasonable to extend a duty to control and/or warn in a therapeutic relationship where there is a specific, current knowledge base as to a patient's status and specifically identifiable risks . . . . ").

Under the facts plead here, the Court must dismiss the claims for failure to warn. By its explicit holding, *Peck* requires an identifiable victim, in the absence of which no duty to warn is generated. *See* 146 Vt. at 66–67; *see also Barrett*, 2010 WL 2837010 at *8 (interpreting *Peck* to require an identifiable victim). Judge Reiss acknowledged cases that would support recognition of a duty without proof of a particularized threat to one or more specific individuals, but her ruling was constrained by Vermont law, and she found *Peck* incompatible with cases with broader holdings decided elsewhere.[4] In some cases, determining whether a victim was identifiable conceivably may require a fact determination. *See Barrett*, 2010 WL 2837010 at *9. A therapist may need to make reasonable inquiry to determine the identity of a threatened person. *See id.* Nevertheless, given the facts alleged here, it is undisputed that Plaintiff Kuligoski was not an identifiable victim considering any information known or knowable by either the Retreat or Northeast Kingdom. Instead, Kuligoski was a member of the public indistinguishable from any other with respect to the foreseeability of his eventual encounter with E.R. Neither the Brattleboro Retreat nor Northeast Kingdom had a duty to warn the public at large of the risks posed by E.R.

Indeed, recognizing the impossibility that either Defendant could have identified the danger to Kuligoski in order to warn him, Plaintiffs do not couch their duty to warn claim in those terms. Rather, Plaintiffs insist Defendants should have warned E.R.'s family of the risks he posed to them and others. Yet, this departure from the particular circumstances undergirding *Peck* only serves to highlight the limitations of the ruling. *Peck* acknowledged that it was creating a duty to protect another from harms posed by third persons previously

---

[4] As noted in *Barrett* , *Peck*'s requirement of an identifiable victim is consistent with a majority of courts ; see, e.g. *Fraser v. United States*, 674 A.2d 811, 815 (Conn.1996) ("our decisions defining negligence do not impose a duty to those who are not identifiable victims"); *Bradley v. Ray*, 904 S.W.2d 302, 312 (Mo.Ct.App.1995) (holding that when health care professional knows that patient presents serious danger of violence to readily identifiable victim, that professional has duty under common law to warn the intended victim or communicate the existence of the danger to appropriate authorities); *Thompson v. Cnty. of Alameda*, 614 P.2d 728, 735 (Cal.1980) ("[W]e nonetheless conclude that public entities . . . have no affirmative duty to warn of the release of an inmate with a violent history who has made nonspecific threats of harm directed at nonspecific victims."); *Glanda v. Tweny Pack Mgmt. Corp.*, 2008 WL 4445257, at * 3 (E.D.Mich. Sept. 29, 2008) ("In the context of special relationships, courts have established a duty of reasonable care toward only those parties who are readily identifiable as being foreseeably endangered.").

unrecognized at common law in Vermont. *Id*. at 64-65; *see also Edson v. Barre Supervisory Union No. 61,* 2007 VT 62, ¶ 13, 182 Vt. 157 (discussing that generally crimes committed by third parties are unforeseeable and cannot form the basis for liability).  Beyond that, *Peck* recognized that it was creating a duty in derogation of, and in tension with, the expectations of confidentiality in the therapist-patient relationship. 146 Vt. at 67-68. The duty for which Plaintiff now seeks recognition is so expansive compared to the *Peck* formulation that it should not fall to a trial court to predict, that under the circumstances here, the Vermont Supreme Court will re-balance the limits *Peck* established, as regards protecting others from third party harm, or as regards the erosion of confidentiality in therapeutic relationships.  Such expansion would appear particularly doubtful here, since even assuming E.R.'s family had been warned of his potential for violent decompensation, it is entirely speculative that such warning would have prevented the encounter between E.R. and Plaintiff Kuligoski.

Accordingly, the Court dismisses Plaintiffs' claims for failure to warn in Count II and Count V. The Court also dismisses Plaintiffs' claims for failure to train in Count III. Plaintiffs claim that Brattleboro Retreat failed to train E.R.'s parents to prevent E.R. from harming others. The claim is an extension of the claimed failure of the duty to warn. If, as the Court concludes, Brattleboro Retreat had no duty to warn, it also could not be charged with the even more attenuated duty of demonstrating to E.R.'s family how to heed the warning.

*Duty to Treat*

The Court must next consider the viability of Plaintiffs' claims for negligent treatment. As to each Defendant, these have been cast in terms of an affirmative obligation to insist on administering treatment that the complaint acknowledges E.R. was unwilling to accept.[5]

Vermont law has not addressed the ability of a third-party to sue for a defendant's claimed negligence in treating a patient who later harms the victim. Nevertheless, some courts allow such claims based on a duty to control. *See Leonard v. State*, 491 N.W.2d 508, 511 (Iowa 1992) (describing the split between states); *see also* Patricia C. Kussmann, *Civil Liability of Psychiatrist Arising out of Patient's Violent Conduct Resulting in Injury to or Death of Patient or Third Party Allegedly Caused in Whole or Part by Mental Disorder*, 80 A.L.R.6th 469, §§ 34–47 (discussing different approaches to the duty to control patients).

The Restatement of Torts purports to address the duties of mental health professionals in such circumstances. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 41. "An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship." *Id.* § 41(a). A mental-health professional has a special relationship with a patient. *Id.* § 41(b). Mental-health professionals have a duty of "reasonable care under the circumstances." *Id.* cmt. g.

The illustrations provided by the Restatement offer examples as to how section 41 might be applied in various circumstances. Illustration 2 describes a situation in which a

---

[5] See Complaint at ¶82 describing Plaintiff's claim that the Retreat had a duty "not to discharge" E.R.; see Complaint at ¶ 129 describing Plaintiff's claim that NKHS had a duty "to take immediate and affirmative steps to treat E.R." irrespective of his patent disinterest in voluntarily accepting such treatment.

therapist knows a patient suffers from mild depression but the patient has not indicated a desire to commit violence. If the patient later attacks his parents, the therapist is not liable because he had no reason to expect the violent outburst. On the other hand, illustration 5 depicts a situation suggesting liability when a therapist ignores dangers reasonably associated with the behavior of a schizophrenic patient. Where the patient calls the therapist, indicates he has not taken his medication, requests an immediate meeting, and indicates he will harm pedestrians if provoked, the therapist must take action reasonably calculated to address the foreseeable danger to others.

The Supreme Court of Rhode Island considered a similar set of issues, analyzing the Restatement's suggestion of duty in the context of particular circumstances. *See Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 658 (R.I. 2009). In *Santana*, a patient attacked an employee at a drycleaners and caused severe brain injuries. *Id.* at 655. The patient had received years of outpatient care from a community treatment facility, but stopped attending treatment sessions approximately four months before the attack. *Id.* at 655–56. The victim brought suit against the mental health center for negligently failing to supervise or hospitalize the patient. *Id.* at 656. The mental health center moved for summary judgment on lack of legal duty. *Id.* at 657.

The *Santana* court granted summary judgment based on the absence of duty. A party who claims negligence must first show the defendant had a duty to the plaintiff. *Id.* at 658. There is no duty to control the conduct of a third-party unless a special relationship exists. *See id.* A mental health professional may seek to have a patient committed involuntarily, but the decision is discretionary. *Id.* at 661. The court then applied a multi-factor test to determine if a duty existed. *Id.* at 664–65. The test weighed the relationship between the patient and the therapist, the foreseeability of the harm, the burden liability would impose on defendant, and the public policy considerations. *Id.* The court reasoned a voluntary outpatient treatment relationship was not a sufficiently strong relationship to establish a duty of intervention to control the patient's behavior in the situation present. *Id.* at 665. The foreseeability of the harm was low because there was no evidence the patient could have been involuntarily committed. *Id.* at 666. Imposing a duty on health care providers to seek involuntary commitment of their patients as a measure of protecting the public was in unsupportable tension with Rhode Island's policy of keeping mentally ill patients in the least restrictive environment possible, a policy grounded in constitutional recognition of the civil rights of the patient. *Id*. at 666–67. Therefore, the liberty interests of mentally-ill patients weighed against finding a duty. *Id*. at 667.

In contrast, there is some authority for recognizing a possible cause of action against a therapist for negligently treating a mentally-ill patient, even when the particular victim was not identifiable as a result of the provider-patient relationship. *See Rivera v. N.Y.C. Health & Hosps. Corp.*, 191 F. Supp.2d 412, 418 (S.D.N.Y. 2002). In *Rivera*, a mental health patient pushed the plaintiff in front of an oncoming train. *Id.* at 415. The plaintiff sued the patient's therapist for negligent treatment. *Id.* The therapist moved to dismiss on the theory that health care providers "owe no duty of care to the general public arising from the care of an outpatient who is receiving treatment on a voluntary basis." *Id*. at 417. The court declined to impose any bright-line rule, concluding that under certain circumstances mental health professionals may owe a duty to members of the public at large. *Id*. The court concluded that therapists have a special

duty to look after the health of their patients, and that those obligations may extend to others including the general public. *Id.* The court denied the motion to dismiss because the existence of a duty, even to the general public, was highly fact-specific. *Id*. at 425. The court declined to hold as a matter of law that it could not arise under the facts as plead. *Id.* at 421–22.

In this case, Defendants had no duty to treat E.R. in a manner so as to afford protection to Plaintiff. The Restatement suggests a therapist may have liability where the therapist knows of an imminent threat to a defined group of people. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 41, ill. 2, 5. Even assuming each Defendant had sufficient information to know of E.R.'s potentially violent tendencies, neither could predict when or under what circumstances E.R. would become generally dangerous, and the foreseeability of his particular danger to Michael Kuligoski was non-existent. Almost three months passed between the last time personnel at NKHS saw E.R. and his assault on Mr. Kuligoski. Plaintiffs do not allege E.R. committed other assaults during that time, much less that NKHS knew of any assaultive or threatening behavior by him in the intervening period. The Retreat is further removed from being implicated in the assault because of the even longer passage of time since its discharge of E.R., as well as by the intervening involvement of NKHS in his treatment. The claim that Defendants could have exercised reasonable care that would have prevented an eventual injury to an unknown person months after E.R. terminated treatment, stretches the concept of common-law duty to act reasonably to prevent harm beyond any recognized bounds.[6]

The analysis in *Santana* is persuasive, and compels a similar result here. *See* 969 A.2d at 664–67. As in *Santana*, E.R. injured the victim months after his last outpatient visit (and another month beyond his discharge from inpatient care at the Retreat). *See id.* at 655–56. By the time of the assault, E.R.'s relationship with each Defendant was attenuated by a period of no contact. Moreover, there was never an adjudication resulting in an order of involuntary hospitalization for E.R. at the Retreat, or an order on non-hospitalization with respect to any treatment that might have been compelled through NKHS. Although CVMC commenced the process for an involuntary commitment in October of 2010, the complaint does not establish any judicial involvement before E.R.'s discharge on November 12. That discharge would have resulted in the dismissal of involuntary hospitalization proceedings if they had not already been discontinued. It is entirely speculative whether a court would have granted an order of involuntary hospitalization, or an order of non-hospitalization requiring compulsory treatment, had those proceedings gone forward. It is entirely speculative whether NKHS had sufficient evidence to pursue another application for involuntary treatment in December, or whether such a petition would have been granted. In addition, while capable of initiating proceedings for involuntary treatment, neither Defendant was capable of controlling the eventual prosecution of any such petition, an exercise of discretion vested solely with the State's Attorney's Office or the Office of the Attorney General. See, 18 V.S.A. § 7616. Finally, like Rhode Island, Vermont has a policy of keeping mentally-ill persons in the least restrictive environment possible. *See* 18 V.S.A. § 7617(c) (requiring the court to consider alternatives to hospitalization);

_____

[6] The Restatement illustrations suggesting the possibility of imposing liability for harm to members of the public unidentified until the onset of injury are quite circumscribed. *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 41, ill. 5. Illustration 5 suggests the therapist would be liable to harm to a member of the public where the patient threatens the pedestrians he regularly encounters, and the circumstances make it apparent that the threat is imminent. *See id.*. By contrast, Plaintiffs' case here turns on a danger of harm that was speculative at the time of treatment, occurred months later, and resulted in injury to a victim who was not identifiable.

see also *In re B.L.*, 163 Vt. 168 (state must show by clear and convincing evidence that voluntary treatment is not feasible before court may enter an order of involuntary treatment).

In short, the duty Plaintiff postulates – that each Defendant was required to impose involuntary treatment on E.R. – is a duty neither could possibly sustain under the imperatives limiting proceedings for securing judicial orders for such treatment. As explained by *Santana,* the recognition of such a duty would significantly impact the orderly consideration of mental health proceedings, if the specter of common-law liability becomes implicated in each decision to discharge a patient who might arguably be subject to a petition for involuntary treatment.[7] By the same token, the recognition of such a duty would predictably require a trial within a trial to prove any claim for breach of duty, since liability and proximate cause could not be linked without proof by clear and convincing evidence that an order for involuntary treatment would have issued. As the Court concludes below, consideration of such far-reaching consequences of a further and drastic expansion of common law duty to prevent harm to third persons must properly be left for legislative determination.[8]

In conclusion, the Court dismisses Plaintiffs' claims relating to Defendants' failure to treat E.R. because Defendants owed no duty to Plaintiffs.[9] Defendants cannot be liable to Plaintiffs for negligent discharge, failure to treat, and negligent undertaking without a duty to Plaintiffs. Plaintiffs' claims compel harkening back to the concerns that troubled the dissenters in *Peck*.

---

[7] See, also, *Leonard v. State*, 491 N.W.2d 508, 512 (Iowa, 1992), in which the court found "a psychiatrist owes no duty of care to an individual member of the general public for decisions regarding the treatment and release of mentally ill persons from confinement." The Court observed:

> [Decisions] in the realm of mental commitment rest not only on medical judgments but on societal judgments about a community's tolerance for the sometimes deviant behavior of mentally ill persons. It is not only the customary procedure, but the constitutionally and statutorily mandated requirement, to treat even seriously mentally impaired persons in the least restrictive environment medically possible. Such a decision necessarily requires the psychiatrist to forecast the patient's likely behavior towards others upon release. We are convinced that if that prognosis were subject to second-guessing by any member of the public who might later be injured by the patient, it could severely chill the physician's capacity for decision making and ultimately threaten the integrity of our civil commitment system.

*Id.*

[8] The Court is not persuaded by the reasoning of *Rivera*, see 191 F.Supp.2d at 421–22. The holding rejects any analytic framework for pleading facts sufficient to establish a duty in an area where prior caselaw, and statutory concerns for confidentiality and the treatment of mentally ill patients, have always established such limits. *Peck* is the best indicator that such limits will continue to be recognized in Vermont jurisprudence. The open-ended assessment of duty endorsed by *Rivera* is so at odds with the very limited departure from prior common law principles represented by *Peck,* see 146 Vt. at 66–67, that it appears highly improbable that our Supreme Court would follow the *Rivera* rationale.

[9] Plaintiffs' claims for negligent undertaking fare no better. Plaintiff notes a party who takes on an undertaking may be liable to third parties if the third-party is harmed by the actor's negligence. *See* Restatement (Second) of Torts § 324A (adopted by *Derosia v. Liberty Mut. Ins. Co.*, 155 Vt. 178 (1990)); *see also Barrett*, 2010 WL 2837010, *10 (applying section 324A in the context of an assault by a mentally-ill patient). Although Vermont recognizes the tort of negligent undertaking, the plaintiff must be able to show the defendant had a duty to the plaintiff. As explained above, nothing suggests Defendants had a duty to the public at large to treat E.R. in a manner that would prevent him from harming Plaintiffs.

The issues here present an important social problem. If the common law requirements of the duty to warn, the foreseeability of harm, and ability to control are not warranted or necessary, that is for the legislature to decide. Likewise, the express statutory prohibition for disclosure of confidential patient information, if that is not warranted or necessary, again, it is for the legislature to decide. Otherwise, we will be engaging in flagrant judicial legislation, which must be, and should be, left to the legislative branch of government.

146 Vt. at 70.

Indeed, the Court concludes that Plaintiffs' claims here would push the ruling by the *Peck* majority far beyond the bounds of the holding as limited by the facts there, and the recognition of those claims would stake out expansive new territory not warranted by proper respect for the separation of powers.

## Order

The Court **GRANTS** Defendant Brattleboro Retreat's Motion to Dismiss. The Court **GRANTS** Northeast Kingdom Human Services' Motion to Dismiss.

Electronically signed on September 28, 2014 at 08:23 AM pursuant to V.R.E.F. 7(d).

_____
John P. Wesley
Superior Court Judge

Notifications:
Richard T. Cassidy (ERN 3673), Attorney for Plaintiff Carole Kuligoski
Richard T. Cassidy (ERN 3673), Attorney for Plaintiff Mark Kuligoski
Richard T. Cassidy (ERN 3673), Attorney for Plaintiff James Kuligoski
Ritchie E. Berger (ERN 2871), Attorney for Defendant Brattleboro Retreat
Stephen J. Soule (ERN 3226), Attorney for Defendant Northeast Kingdom Human Services
James W. Spink (ERN 2194), Attorney for Interested Person John A. Rapoza
James W. Spink (ERN 2194), Attorney for Interested Person Christine M. Rapoza
James W. Spink (ERN 2194), Attorney for Interested Person Evan Rapoza