HECHT, Justice
(dissenting).
I cannot agree with the duty analysis undertaken by the majority, and I therefore respectfully dissent, The summary judgment record leaves little doubt that William Cubbage was a highly dangerous sexually violent predator (SVP) with a substantial likelihood of reoffending when he was committed to the civil commitment unit for sexual offenders (CCUSO). Cub-bage had not made progress in the CCU-SO treatment program prior to his release into a small-town nursing home, and CCU-SO administrators believed he continued to present a danger to himself and others such that he must continue to be involuntarily detained. Although Alzheimer’s-related dementia was a factor motivating the CCUSO administrators’ decision to transfer him out of the SVP-treatment program, our duty analysis cannot overlook the fact that Cubbage was an unsuccessfully treated sexual predator at the time the transfer plan was formulated and implemented by the department of human services (DHS), representatives of the attorney general’s office, and representatives of the Iowa public defender’s office. Summary judgment should not have been granted.
I. Additional Background Facts and Proceedings.
I begin with evidence in the summary judgment record that informs my analysis. Cubbage was adjudicated an SVP in 2002 *596 and committed to CCUSO at the age of seventy-one. Considerable evidence supported his adjudication, including four convictions for sexual misconduct perpetrated against children. The convictions in 1987 (lascivious acts), 1991 (indecent contact with a child), 1997 (indecent contact with a child), and 2000 (assault with intent to commit sexual abuse) demonstrate that Cubbage is undoubtedly a member of what our legislature has described as a “small but extremely dangerous group” of persons whose “likelihood of engaging in repeat acts of predatory sexual violence is high.” Iowa Code § 229A.1 (2011).
In his initial commitment evaluation at CCUSO in 2002, Cubbage scored at high risk to reoffend on two actuarial assessments. The evaluator concluded Cubbage was “a menace to the health and safety of others” if “not confined in a secure facility, as a defined by Chapter 229A.” The mental abnormality supporting Cubbage’s classification as a predator was a personality disorder with antisocial and narcissistic features causing him to engage in sexually aggressive behavior.
In enacting chapter 229A, our legislature observed that SVPs tend to have “antisocial personality features” requiring “very long-term” treatment using rehabilitation modalities that are different from those utilized in treating mentally ill persons committed involuntarily under chapter 229. Id. The summary judgment record reveals Cubbage was resistant to treatment at CCUSO. In fact, he stopped participating altogether in treatment sometime in 2005. By the time of his final CCUSO annual evaluation in July 2010, Cubbage “continufed] to display dynamic risk factors that result in him being likely to engage in predatory acts constituting sexually violent offenses if discharged.” Notably, the report generated as part of the 2010 evaluation concluded Cubbage— then age eighty-one—had not shown a change in the mental abnormality that led to his SVP commitment. For that reason, the evaluator who authored the 2010 report found Cubbage was not ready for transitional release under chapter 229A because he failed to meet five of the ten criteria governing eligibility for transitional placement. See id. § 229A.8A.
In particular, Cubbage was ineligible for transitional placement because he had not yet achieved and demonstrated significant insights into his sex offending cycle, he had not accepted responsibility for his past behavior or understood the impact of sexually violent crimes on victims, and he had a major discipline report in June 2010 for disrespect and sexual behavior. See id.
Notwithstanding Cubbage’s unsuccessful course of treatment during eight years of detention as an SVP, his persisting mental abnormality, and his failure to meet the criteria for transitional release, the evaluator opined that “the dynamics involved which have determined Mr. Cubbage [is] more likely than not to re-offend in a sexually violent manner have changed.” The evaluator’s report opaquely concluded Cubbage “does not appear to meet the threshold of [an SVP] as defined in Chapter 229A and currently would be more appropriately characterized as a person who has committed sexual offenses in the past and may be suffering from early stages of dementia.”[5]
*597 CCUSO administrators decided to transfer Cubbage out of the program. In furtherance of the transfer plan, civil commitment proceedings were commenced against Cubbage in the district court for Cherokee County under chapter 229. The State’s petition alleged Cubbage was a danger to himself and others due to his dementia and executive dysfunction. At that time, Cubbage was a sexual predator who had not been successfully treated at CCUSO for the attributes that made him dangerous to others.
On November 16,2010, the district court for Cherokee County entered an order for hospitalization that directed Cubbage be placed in the Pomeroy Care Center for treatment. On November 24, 2010, the execution of the State’s plan to move Cubbage out of CCUSO—the institution created for the express purpose of detaining sexual predators—moved quickly forward. On that day, a motion to discharge Cubbage from his commitment to CCUSO under chapter 229A was filed in Des Moines County district court. The motion advised the court of a mutual agreement between the director of DHS and representatives of the Iowa attorney general’s office and the Iowa public defender’s office that Cubbage “is unable to obtain any further gains from his civil commitment at CCUSO”[6] and is “seriously mentally impaired and in need of full-time custody and care.”
The motion to discharge Cubbage notably failed to inform the district court that he had been unsuccessfully treated for the mental abnormality predisposing him to commit sexually violent offenses. Hearing no resistance to the transfer orchestrated by the State, the district court entered an order that same day implementing the stipulated plan discharging Cubbage from commitment under chapter 229A and committing him to the Pomeroy Care Center under chapter 229.
As the majority has accurately detailed, Cubbage allegedly had nonconsensual sexual contact with Gottschalk, a patient at the Pomeroy Care Center in August 2011. Gottschalk filed a claim with the state appeal board asserting DHS was negligent in failing to (1) prepare and provide a discharge safety plan for Cubbage, (2) follow up with the Pomeroy Care Center to assure Cubbage was properly restrained and/or supervised there, and (3) warn the residents of the Pomeroy Care Center that a sexual deviant was living among them. This action was subsequently commenced by Gottschalk’s estate against Pomeroy Care Center and the State.
The State filed a motion for summary judgment asserting it owed no duty to Gottschalk under either Iowa Code chapter 229 or 229A after Cubbage’s discharge from CCUSO. The district court granted the State’s summary judgment motion, concluding the State owed no duty to Gott-schalk after Cubbage was unconditionally discharged from CCUSO.
II. The Duty Analysis.
I agree with the majority’s conclusion that the issue of whether the State owed a duty to warn Gottschalk of the risk of physical harm posed to her by her exposure to Cubbage—an unsuccessfully treated SVP—was preserved for our review. The theory of liability based upon the *598 State’s failure to warn Gottschalk was asserted in Gottschalk’s appeal board claim and in the plaintiffs resistance to the State’s motion for summary judgment. Although the district court’s summary judgment ruling made no reference to warning, I conclude this theory of liability was clearly before the district court. Because the ruling was based on the proposition that the 2010 order discharging Cubbage from CCUSO terminated any responsibility of the State for Cubbage’s postdis-charge conduct as a matter of law, a motion under Iowa Rule of Civil Procedure 1.904(2) requesting the district court to expressly rule on whether the State owed a duty to warn Gottschalk about the risk of her exposure to Cubbage at the Pomeroy Care Center would have been pointless. Thus, like the majority, I conclude we should address whether the State owed a duty to warn Gottschalk of the risk of physical harm posed to her by Cubbage.
Unlike the majority, however, I conclude the State owed a duty to warn Gottschalk. An actor ordinarily owes a duty to exercise reasonable care when the actor’s own conduct creates a risk of physical harm. Thompson v. Kaczinski, 774 N.W.2d 829, 834 (Iowa 2009). As we noted in Thompson, this general duty is explained in section 7 of the Restatement (Third) of Torts. Id. (citing Restatement (Third) of Torts: Liab. for Physical Harm § 7, at 90 (Am. Law Inst., Proposed Final Draft No. 1, 2005)). However, the majority has chosen to view the physical and emotional harm claimed by the plaintiff in this case as harm allegedly caused exclusively by Cub-bage—not the conduct of state actors. Accordingly, the court’s analysis of the duty issue is not based on the general duty principles under section 7 of the Restatement (Third).[7]
The proposition that an actor generally owes no duty of care with respect to risks of physical harm created by another is expressed in section 37 of the Restatement (Third). Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37, at 2 (Am. Law Inst. 2012). This proposition constitutes a no-duty rule based on policy. Id. § 37 cmt. b, at 5. There are exceptions to this no-duty rule, however. In some circumstances, the common law imposes an affirmative “duty to take action to prevent or ameliorate the risk of harm created by others.” Id. For example, “[a]n actor in a special relationship with another owes a duty of reasonable care to third persons with regard to risks posed by the other that arise within the scope of the relationship.” Id. § 41(a), at 64-65. Section 41 lists several special relationships giving rise to a duty of reasonable care: a parent with children, a custodian with those in its custody, an *599 employer with employees when the employment facilitates harm to third parties, and mental-health professionals with patients. Id. § 41(b). This list of special relationships supporting the existence of a duty is not exclusive. Id. § 41 cmt. i, at 73.[8]
I would hold in this case that a special relationship existed between the State and Cubbage supporting the imposition of a duty to warn Gottschalk. The relationship between CCUSO and Cubbage is closely analogous to a mental-health professional-patient relationship. See id. § 41(b), at 65. Obvious and compelling policy reasons support the imposition of a duty of care on the State as it transferred an unsuccessfully treated—and therefore dangerous—sexual predator to a nursing home populated by a finite number of especially vulnerable residents. A reasonable fact finder could find on this record that Cubbage was an SVP whose persistent mental abnormality rendered him likely to reoffend sexually before and after the transfer to Pomeroy Care Center. He had been resistant to treatment at CCUSO during the five years prior to his discharge, and the evidence tending to prove he had not been meaningfully rehabilitated during his detention is overwhelming. •
The duty I would recognize in this case is distinguishable from the one claimed but rejected by this court in Leonard v. State, 491 N.W.2d 508 (Iowa 1992). In Leonard, we held a state-employed psychiatrist who discharged a patient from a mental-health institute owed no duty to a person subsequently injured by the patient. Id. at 512. We reasoned that a no-duty rule was justified in that case because the plaintiff was a member of the public at large—not a reasonably foreseeable victim of the patient’s dangerous and violent tendencies. Id. at 511-12. In this case, Gottschalk was not merely a member of the public at large. A reasonable fact finder could find she was among the discrete universe of known Pomeroy Care Center residents who would foreseeably be exposed to Cubbage’s predatory behavior.
The majority nonetheless affirms the no-duty rule applied by the district court in this case because ■ the State obtained a discharge order from the district court prior to Cubbage’s transfer to the Pomer-oy Care Center. I am not persuaded. The motion for discharge was presented to the district court in the form of a stipulated proposed disposition. Although the resulting order discharging Cubbage from CCU-SO was clearly binding on the parties who were before the court stipulating to the proposed discharge, we should not conclude it absolved the State of a duty of care to Gottschalk under the extraordinary circumstances presented here.
We should not view the court order effectuating the stipulated discharge of Cub-bage from CCUSO as an immunity-creating device for the State. I am not prepared to accept the notion that the district court for Des Moines County viewed the discharge order as adjudication of the nature and extent of the risk created by Cubbage upon discharge. The order was instead a procedural device allowing, the parties before the court to change the location, of Cubbage’s placement by agreement. No one appeared before the court opposing *600 the transfer. No one appeared voicing caution about the grave risk that would be created by discharging Cubbage from CCUSO and transferring him to a nursing home.
The administrators of CCUSO wanted to move Cubbage out because he was resistant to SVP treatment and suffered from dementia; the Pomeroy Care Center had an interest in filling a bed; and Cubbage had no reason to oppose the move to a less-restrictive environment in the nursing home. These are not circumstances engendering a legitimate policy-based no-duty rule for a class of cases. On the contrary, they are circumstances crying out for the imposition of a duty of reasonable care under our tort law. I would therefore reverse the summary judgment and remand for further proceedings in the district court.
Zager, J., joins this dissent.

. The report thus appears to be internally inconsistent. On the one hand, it discloses Cubbage continues to present a risk to reof-fend; on the other hand, the report suggests Cubbage "does not appear” to meet the threshold of an SVP. The report noted that Cubbage appeared to be "less able to participate due to his cognitive impairments and other medical conditions.” The record does not reveal the extent or severity of Cubbage’s cognitive impairments as they may have existed in July 2010 or thereafter; nor does it *597 explain why an SVP with dementia would be less dangerous to others than an SVP without dementia.

. Because the record reveals Cubbage had been uncooperative in the treatment process since at least 2005 and his mental abnormality making him likely to reoffend remained as of July 2010, it is unclear to me what "gains” Cubbage had achieved while at CCUSO.

. Although the majority has addressed the State’s liability under the rubric of special relationship, I would leave room for the possibility that the State’s conduct in this case directly caused a risk of physical harm to Gottschalk by transferring Cubbage—an unsuccessfully treated SVP—to the Pomeroy Care Center. See Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37 cmt. d, at 4-5 (Am. Law Inst. 2012) (noting that "an actor’s conduct may increase the natural or third-party risk” and thereby "creates risks of its own”). A reasonable fact finder could find that the State’s transfer of Cubbage to a target-rich nursing home environment that lacked CCUSO-like security substantially increased the risk that Cubbage would offend if reasonable warnings were not given to those exposed to the risk at the care center. Such risk-creating conduct is governed by the ordinary duly of reasonable care addressed in section 7 of the Restatement (Third). Id. § 7, at 77 (Am. Law Inst. 2010). Because the majority has addressed the State's liability in this case under the rubric of special relationship, however, I will similarly focus my analysis there as well. I would, however, reach the same result under a section 7 duty analysis.

. Similarly, comment b to section 37 of the Restatement (Third) explains that
the affirmative duties identified in [Chapter 7 of the Restatement (Third) of Torts] are not an exclusive list; courts may identify additional areas for affirmative duties in the future, just as courts may decide, for reasons of policy or principle, that additional no-duty rules should be recognized.
Restatement (Third) of Torts; Liab. for Emotional & Physical Harm § 37 cmt. b, at 3.