# IN THE SUPREME COURT OF IOWA

No. 14–1326

Filed April 14, 2017

Amended July 3, 2017

**ESTATE OF MERCEDES GOTTSCHALK** by Coexecutors
RICHARD GOTTSCHALK and REBECCA RASSLER,

Appellants,

vs.

**POMEROY DEVELOPMENT, INC**. d/b/a **POMEROY CARE CENTER,**

Defendant,

**STATE OF IOWA,**

Appellee.

_____

**POMEROY DEVELOPMENT, INC.** d/b/a **POMEROY CARE CENTER,**

Third-Party Plaintiff-Appellant,

vs.

**STATE OF IOWA,**

Third-Party Defendant-Appellee.

_____

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Calhoun County, Thomas Bice, Judge.

An estate and a care center request further review of a court of appeals decision finding the State did not owe either of them a duty of care. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Willis J. Hamilton of Hamilton Law Firm, P.C., Storm Lake, for appellants.

Thomas J. Miller, Attorney General, and Joanne Moeller, Assistant Attorney General, for appellee.

David H. Luginbill and Michael J. Streit of Ahlers & Cooney, P.C., Des Moines, for defendant Pomeroy Development.

**WIGGINS, Justice.**

A person whom the courts released from the State's civil commitment unit for sexual offenders (CCUSO) and then recommitted to a care center attacked the estate's decedent at the care center. The estate filed a petition against the care center and the State claiming negligence. The care center brought a third-party claim against the State for indemnity. The State filed a motion for summary judgment arguing it owed no duty of care to the estate's decedent or the care center. The district court agreed and entered judgment for the State. The estate and the care center appealed. We transferred the case to the court of appeals. The court of appeals affirmed the district court judgment. We granted further review. On appeal, we find on the issues preserved that the State did not owe a duty of care to either the estate's decedent or the care center. Accordingly, we affirm the decision of the court of appeals and the judgment of the district court.

## I. Background Facts and Proceedings.

Mercedes Gottschalk's family admitted her to the Pomeroy Care Center in Pomeroy on September 5, 2009. Thereafter, on December 8, 2010, the court civilly committed William Cubbage to the Pomeroy Care Center. Cubbage's previous criminal and medical history is relevant to this appeal.

The State previously convicted Cubbage of "four sexually violent offenses . . . : assault with intent to commit sexual abuse (in 2000), indecent contact with a child (1997 and 1991), and lascivious acts with a child (1987)." *In re Det. of Cubbage*, 671 N.W.2d 442, 443 (Iowa 2003). A doctor diagnosed him with pedophilia and a personality disorder not otherwise specified with antisocial and narcissistic features. *Id.* The doctor believed those conditions were "mental abnormalities" that "made

it seriously difficult for Cubbage to control his sexually dangerous behavior." *Id.* On May 21, 2002, Cubbage was adjudicated a sexually violent predator pursuant to Iowa Code chapter 299A, and the court committed him to the custody of the director of the Iowa Department of Human Services for placement at CCUSO until his "mental abnormality has so changed that he is safe to be placed in the transitional release program or discharged."

In August 2006, while still in custody at CCUSO, a doctor diagnosed Cubbage with dementia of the Alzheimer's type, declining mental functioning, and several physical and mental ailments. A ninety-day patient assessment at CCUSO in May 2010, indicated that the staff agreed the "best avenue for Mr. Cubbage would be to place him in secure care for the rest of his life . . . pending DHS Directors approval."

In July, Dr. Michael Ryan, a psychologist at CCUSO, prepared an annual report summarizing Cubbage's progress, and he made recommendations regarding Cubbage's possible release. Based on his evaluation, Dr. Ryan determined Cubbage did not meet the criteria for transitional release, but that he "does not currently meet the definition of a sexually violent predator as described in 229A."

On November 16, a hearing was held in Cherokee County pursuant to Iowa Code section 229.13 (2011). The district court found Cubbage seriously mentally impaired and, due to his dementia and executive dysfunction, he was a danger to himself and others. Thus, the district court ordered Cubbage placed in the Pomeroy Care Center for appropriate treatment under the care of Dr. Ted George of Pocahontas, Iowa.

Subsequently, on November 24, a state public defender acting on behalf of Cubbage, filed a motion pursuant to Iowa Code section 229A.10

requesting the court discharge Cubbage from civil commitment. The motion provided that the director of human services, the Iowa attorney general's office, and the Iowa public defender's office mutually agreed Cubbage is "unable to obtain further gains from his civil commitment at CCUSO" and is "seriously mentally impaired and in need of full-time custody and care." That same day, the district court in Des Moines County entered its order discharging Cubbage from commitment under section 229A.10 and committing him to the Pomeroy Care Center pursuant to Iowa Code chapter 229 and the Cherokee County court's November 16 order.

Before Cubbage began residing at the Pomeroy Care Center, the administrator and director of nursing at the care center met with CCUSO staff members to discuss Cubbage's history as a sex offender as well as his diagnosis of pedophilia and dementia. The CCUSO staff told the care center's administrator that it was not likely Cubbage would be a risk. The administrator was not aware the CCUSO doctors had previously opined that Cubbage was a danger to others at the time he was committed to the care center. The administrator's understanding was that Cubbage was "being transferred because his physical condition had advanced to the point where he could no longer participate in active treatment." The director of nursing at the care center understood that Cubbage was a "child predator," and CCUSO staff told her that he would be "no risk at all" to "older folks." The parties discussed his access to children and the care center's ability to monitor him in the presence of children.

On August 21, 2011, an eight-year-old child visiting the care center witnessed Cubbage sexually assaulting Gottschalk. On

November 18, the State transferred Cubbage from the care center to the Newton Correctional Facility.

Gottschalk sued the care center for providing her care in a reckless and negligent manner. After Gottschalk's death, her estate substituted itself as the plaintiff. The estate also sued the State for negligence. Specifically, the estate alleged the State was negligent because (1) it had a duty to "prepare and approve a safety plan to protect the residents" of the care center after Cubbage was placed there and (2) it had a duty to "inspect and determine whether or not appropriate safety precautions were being followed by the Pomeroy Care Center." The estate also alleged the State decreased nursing home oversight thereby "intentionally causing an unacceptable risk of injury to the residents."

The Pomeroy Care Center brought a cross-claim alleging negligence on the part of the State for contribution and indemnity. The care center contended the State was negligent because (1) it failed to "properly supervise and monitor the co-resident, Cubbage, pursuant to Court Order and Iowa code chapter 229;" (2) it represented to "Defendant prior to his admission that the co-resident, Cubbage, was no longer a risk or a threat to society;" and (3) it represented to "Defendant prior to his admission that the co-resident, Cubbage, was no longer a risk or threat to elderly victims."

The State moved for summary judgment on the estate's and the care center's causes of action. The State argued that once it discharged Cubbage from CCUSO, it owed no duty of care to supervise and monitor Cubbage, to create or supervise any safety plan related to Cubbage, or to inspect the Pomeroy Care Center and follow-up with regard to safety precautions. The State also argued Iowa Code section 669.14(4) prohibits the care center from suing the State based on the State's

alleged misrepresentations concerning Cubbage's risk to other residents in the care center.

In its resistance to the State's motion for summary judgment, the estate argued the State "did not inspect the Pomeroy nursing home to determine whether safety protocols were in place," and the State had a "duty of care . . . to warn the residents and assure that safety protocols were in place to protect the residents from harm and that a failure to do so would constitute negligence."

The Pomeroy Care Center resisted the State's motion by arguing the State negligently discharged Cubbage, the State acted negligently in failing to supervise and monitor Cubbage, and issues of material fact precluded summary judgment. The care center also requested an extension of time to respond to the State's summary judgment motion pending a ruling on the estate's motion to compel production of documents filed June 19, 2014, and the estate's motion to inspect court records filed June 23.

The district court granted the State's motion, concluding that because Cubbage was unconditionally discharged from CCUSO, the State had no statutory or common law duty to supervise, monitor, or approve a safety plan, and that "[w]ithout the existence of a duty, any claim for negligence [by the Estate or the Pomeroy Care Center] must fail." Further, the court held the doctrine of sovereign immunity prevented any claim of misrepresentation against the State pursuant to Iowa Code section 669.14(4). Finally, because the court's ruling dismissed all claims against the State, it concluded the estate's motion to compel discovery was moot.

The estate and Pomeroy appealed.[1] We transferred the case to the court of appeals, which affirmed the district court ruling. We granted the estate's and Pomeroy Care Center's applications for further review.

## II. Scope of Review.

We review a district court ruling on summary judgment for correction of errors at law. *Sanon v. City of Pella*, 865 N.W.2d 506, 510 (Iowa 2015). Summary judgment is appropriate when the moving party demonstrates "there are 'no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting *Ne. Cmty. Sch. Dist. v. Easton Valley Cmty. Sch. Dist.*, 857 N.W.2d 488, 491–92 (Iowa 2014)). "A genuine issue of fact exists if reasonable minds can differ on how an issue should be resolved. When a fact's determination might affect the outcome of the suit, it is material." *Walker v. State*, 801 N.W.2d 548, 554 (Iowa 2011) (citation omitted).

"[W]e examine the record in the light most favorable to the party opposing the motion for summary judgment" when determining if the moving party met its burden. *Minor v. State*, 819 N.W.2d 383, 393 (Iowa 2012). Based on the record before the district court, we must determine "whether there was a material fact in dispute and if not, whether the district court correctly applied the law." *Id.* (quoting *Robinson v. Fremont County*, 744 N.W.2d 323, 325 (Iowa 2008)).

We also recognize that "questions of negligence or proximate cause are ordinarily for the jury" and "only in exceptional cases should they be decided as a matter of law." *Thompson v. Kaczinski*, 774 N.W.2d 829,

---

[1]The district court's summary judgment dismissed only the State from the case and the action remains pending as to defendant Pomeroy Development. We granted interlocutory appeal.

832 (Iowa 2009) (quoting *Clinkscales v. Nelson Sec., Inc.,* 697 N.W.2d 836, 841 (Iowa 2005)).

### III. The Estate's Appeal.

At the onset of this discussion, we note that the estate has not been consistent with its arguments and theories of recovery from the tort claim it filed through its appellate brief. We will only consider the issues raised by the estate in its appellate brief. In its brief, the estate makes three claims. They are set forth as follows:

> All of the foregoing demonstrates that a reasonable person would be justified to believe that the residents of the Pomeroy Care Center would be at foreseeable risk of harm by William Cubbage and that there existed a duty of care by the State not to release William Cubbage into a target rich environment. These facts would also establish a duty to warn the residents and assure that safety protocols were in place to protect the residents from harm and that a failure to do so would constitute negligence.

### A. Whether the State Had a Duty of Care Not to Release William Cubbage into a Target-Rich Environment.

Before reaching the merits of this issue, we must first decide if the estate preserved error on this issue. We find the estate did not preserve error on this issue.

A party must ordinarily raise an issue in the district court and the district court must decide that issue before we may decide it on appeal. *Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002). The underlying objective of this rule is to ensure "orderly, fair[,] and efficient administration" of justice by preventing parties from presenting one case at trial and another on appeal. *State v. Mann,* 602 N.W.2d 785, 790 (Iowa 1999) (quoting *State v. Tobin,* 333 N.W.2d 842, 844 (Iowa 1983)). Thus, it serves the purpose of ensuring both opposing counsel and the district court receive notice of the basis for a claim at a time when

corrective action is still possible. *See State v. Johnson*, 476 N.W.2d 330, 334 (Iowa 1991); *see also State v. Milner*, 571 N.W.2d 7, 12 (Iowa 1997).

In deciding whether a party has preserved error, the purposes of our error preservation rules guide us. *Lee v. State*, 815 N.W.2d 731, 739 (Iowa 2012); *Mann*, 602 N.W.2d at 790–91. Accordingly, "we recognize an exception to the general error-preservation rule when the record indicates that the grounds for a motion were obvious and understood by the trial court and counsel." *State v. Williams*, 695 N.W.2d 23, 27–28 (Iowa 2005); *In re Det. of Hodges*, 689 N.W.2d 467, 470 (Iowa 2004). Generally, so long as a party timely brings the nature of the error claimed to the attention of the district court, error preservation does not turn on the thoroughness of counsel's researching or briefing. *Summy v. City of Des Moines*, 708 N.W.2d 333, 338 (Iowa 2006), *overruled in part on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016). Nonetheless, if the court does not actually rule on the claim asserted, a party must seek an expanded ruling to preserve it. *State v. Webster*, 865 N.W.2d 223, 231–32 (Iowa 2015).

In its ruling, the district court stated,

> It is factually established that Mr. Cubbage had been unconditionally discharged from the CUSSO unit in November of 2010. This discharge was not "transitional" or "conditional." Once discharged, the duty of the State to supervise or monitor Mr. Cubbage ended. "Discharge" is defined by Iowa Code 229A.2(3) as meaning ". . . . an unconditional discharge from the sexually violent predator program." At that time, the State owed no duty to provide a "safety plan" as contemplated by Iowa Code 229A.8A(6) because of the unconditional nature of the discharge. Without the existence of a duty, any claim for negligence must fail. Further, this Court finds no common law duty as defined by prior case law covering the facts of this case. Simply stated, since Cubbage was unconditionally discharged from CUSSO, there was no statutory or common law duty placed upon the State to supervise, monitor or

approve a "safety plan" and absent a duty, Plaintiff's claims in this regard must be dismissed. See *Minor v. State*, 819 N.W.2d 383 (Iowa 2012); *Leonard v. State*, 491 N.W.2d 508 (Iowa 1992).

The district court did not rule on or consider any claim by the estate that the State had a duty of care not to release William Cubbage into a target-rich environment. The estate did not make this claim in its petition or in its resistance to the State's motion for summary judgment. The first time the estate raised this issue was in its appellate brief. We do not consider issues for the first time on appeal. *Geisler v. City Council of Cedar Falls*, 769 N.W.2d 162, 166 (Iowa 2009). Accordingly, we will not reach this issue because the estate failed to preserve error on the issue in this appeal.

**B. Whether the State Had a Duty to Warn the Residents of the Dangers Cubbage Presented in Order to Protect the Residents from Harm.** Again, before reaching the merits of this issue, we must first decide if the estate preserved error on this issue. The court of appeals found the estate did not preserve error on this issue. We disagree.

Here, the estate raised the issue of failure to warn the vulnerable residents of the Pomeroy Care Center in its resistance to the State's motion for summary judgment. Thus, the court and the State had notice for the basis of this claim. In its order for summary judgment, the district court held that "[w]ithout the existence of a duty, any claim for negligence must fail," and found no common law duty applied in this case. We find the district court contemplated the failure to warn claim raised by the estate in its resistance to the State's motion for summary judgment, thus preserving the theory of negligent failure to warn for appeal.

The district court determined that once the court discharged Cubbage from CCUSO, the State owed no duty to warn Gottschalk of the dangers Cubbage posed. A negligence claim requires "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Thompson*, 774 N.W.2d at 834 (quoting *Stotts v. Eveleth*, 688 N.W.2d 803, 807 (Iowa 2004)). "Whether a duty arises out of a given relationship is a matter of law for the court's determination." *Id.*

Historically, we have considered three factors when determining whether a duty to exercise reasonable care exists: "the relationship between the parties, the foreseeability of harm, and public policy." *McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012). We have not viewed these factors as "three distinct and necessary elements, but rather as considerations employed in a balancing process." *Thompson*, 774 N.W.2d at 834. Ultimately, "whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm." *Id.* (quoting *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999)).

In *Thompson*, we adopted the duty analysis of the Restatement (Third) of Torts: Liability for Physical & Emotional Harm, which provides that "the assessment of the foreseeability of a risk" is no longer part of the duty analysis, but is "to be considered when the [fact finder] decides if the defendant failed to exercise reasonable care." *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 391 (Iowa 2010) (quoting *Thompson*, 774 N.W.2d at 835 (citing Restatement (Third) of Torts: Liab. for Physical Harm § 7 cmt. *j*, at 97–98 (Am. Law Inst., Proposed Final Draft No. 1, 2005))).

Turning our analysis to the Restatement (Third) of Torts, in *Thompson* we held that "[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." *Id.* (quoting *Thompson,* 774 N.W.2d at 834). Only "in exceptional cases" will this general duty of reasonable care not apply. *Id.* (quoting *Thompson*, 774 N.W.2d at 835). "An exceptional case is one in which 'an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases.'" *Id.* (quoting *Thompson*, 774 N.W.2d at 835).

The Restatement (Third) has addressed the issue of a defendant's liability for the actions of a third party based on a special relationship with the person posing risks. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 41, at 64–65 (Am. Law Inst. 2012). In relevant part, it provides,

> (a) An actor in a special relationship with another owes a duty of reasonable care to *third parties* with regard to risks posed by the other that arise within the scope of the relationship.

> (b) Special relationships giving rise to the duty provided in Subsection (a) include:

> . . . .

> (4) a mental-health professional with patients.

*Id.*[2] While an affirmative duty might exist pursuant to section 41 of the Restatement (Third), "a court may decide, based on special problems of

_____

[2]"Section 315 of the Second Restatement of Torts stated the general proposition that there is no affirmative duty to control the conduct of a third party from causing harm to another." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 41 cmt. *a*, at 65. Section 41 of the Restatement (Third) "replaces §§ 315(a), 316, 317, and 319 and includes an additional relationship creating an affirmative duty, that of mental health professionals and patient." *Id.*

principle or policy that no duty or a duty other than reasonable care exists." *Id.* cmt. *b*, at 65; *see also id.* § 7(b), at 77 (Am. Law Inst. 2010).

Prior to our adoption of the Restatement (Third) in *Thompson,* we found a special relationship existed between a psychiatrist and a patient, giving rise to a duty to either control the behavior of the other person or to protect a third party. *Leonard v. State*, 491 N.W.2d 508, 510–11 (Iowa 1992). There, we stated, "that the risks to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions." *Id.* at 512. We then held that the duty of care did not apply to the general public. *Id.* In making this decision, "the principle that the scope of the duty turns on the foreseeability of harm to the injured person" guided our decision. *Id.* at 511. In *Leonard,* our analysis only addressed a psychiatrist's duty to members of the general public, and we did "not decide what duty, if any, would attach to the discharge decision if the psychiatrist had reason to believe some particular person would be endangered by the patient's release." *Id.* at 512.

Before we analyze the facts in this case under the Restatement (Third) and *Leonard,* we must first decide if a special relationship existed. In *Leonard,* the hospital made the decision to release the patient from its care. In this case, the State did not make the decision to release Cubbage from CCUSO or commit him to the Pomeroy Care Center. The district court entered an order discharging Cubbage from CCUSO pursuant to Iowa Code section 229A.10. In its order, the court acknowledged that it reviewed the motion to discharge and found good cause to discharge Cubbage from his civil commitment under chapter 229A. Implicit in the court's finding was that the State could not "show

beyond a reasonable doubt that [Cubbage's] mental abnormality or personality disorder remains such that [Cubbage] is likely to engage in predatory acts that constitute sexually violent offenses if discharged." *See* Iowa Code § 229A.10. Under the Code, the court was required to discharge him. *Id.*

Another district court held a hearing and committed him to the Pomeroy Care Center under Code section 229.13. The court stated its reason for the commitment was "due to his dementia and executive dysfunction, thus being a danger to [himself] and others." "Dementia" is "the loss, usually progressive, of cognitive and intellectual functions, without impairment of perception and consciousness." *Dementia, Stedman's Medical Dictionary* (27th ed. 2000). Executive functions include "[h]igher order cognitive processes such as goal setting, planning, organization, adaptive responding, and self-monitoring." John F. Clarkin et al., *The Role of Psychiatric Measures in Assessment and Treatment, in Textbook of Psychiatry* 73, 92–93 (Robert E. Hales, Stuart C. Yudofsky, Glen O. Gabbard, eds., 5th ed. 2008). In other words, Cubbage was committed to the Pomeroy Care Center because his dementia made him unable to take care of himself.

The district courts made the ultimate decision to release Cubbage from CCUSO and commit him to the Pomeroy Care Center, not the State. The courts made their decisions after they considered the evidence before them. The courts reviewed the expert testimony and reports and decided the law required them to release Cubbage from CCUSO and commit him to the Pomeroy Care Center. The courts, in making their decisions, had the option of giving as much weight as they thought the expert testimony deserved. *Crouch v. Nat'l Livestock Remedy Co.*, 210 Iowa 849, 851–52, 231 N.W. 323, 324 (1930). The courts could have rejected or accepted

the expert testimony. *Id.* Furthermore, Iowa Code chapter 229 and 229A place the responsibility on the court to examine the evidence and not merely act as a rubber stamp of the expert testimony. *See Jacobs v. Taylor*, 379 S.E.2d 563, 566 (Ga. Ct. App. 1989) (stating "this court will not read the statutory responsibility placed on a committing court . . . as consisting merely of 'rubberstamping' the opinions of expert witnesses"). Although the court had the authority to release Cubbage from CCUSO with supervision, it chose not to. Iowa Code § 229A.9A. Instead, one court discharged Cubbage from CCUSO and another committed him to the Pomeroy Care Center. Neither the director nor any staff member of CCUSO had the authority to release or discharge Cubbage. Our courts discharged Cubbage. Accordingly, we find there was no special relationship to invoke section 41 of the Restatement (Third). Consequently, the district court was correct in finding the State had no duty to warn the residents.

**C.** **Whether the State Had a Duty to Assure that Safety Protocols Were in Place to Protect the Residents from Harm.** We just found there was no special relationship invoking section 41 of the Restatement (Third) to create a duty upon the State to warn Gottschalk of Cubbage's alleged dangerous propensities. For the same reasons that the State did not owe a duty to warn Gottschalk, we find the State did not have a duty to assure that safety protocols were in place to protect the residents from harm.

**D.** **Whether the District Court Erred in Finding the State Immune from Liability Under Iowa Code Section 669.14.** The State claims as an affirmative defense it is immune from liability under the Iowa Tort Claims Act. The law provides,

> The provisions of this chapter shall not apply with respect to any claim against the state, to:
>
> . . . .
>
> 4. Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Iowa Code § 669.14(4).

The record does not disclose any representations made to Gottschalk by the State. We have also found the State did not have a duty to do so. Accordingly, we need not address this issue as to the estate.

**E. Conclusion.** For all the reasons stated above, we find the district court was correct in granting the State's motion for summary judgment against the estate.

**IV. The Pomeroy Care Center's Appeal.**

The Pomeroy Care Center also has not been consistent with its arguments and theories of recovery from the petition it filed through its appellate brief. We will only consider the issues raised by the care center in its appellate brief. In its brief, the care center makes five arguments. First, it argues the district court erred in finding as a matter of law that the State owed no duty of care to the care center. Next, it argues a genuine issue of material fact exists regarding whether the State acted negligently in discharging Cubbage from CCUSO. Third, it argues a genuine issue of material fact exists regarding whether the State acted negligently in performing its role in the civil commitment of Cubbage to the Pomeroy Care Center under Iowa Code chapter 229. Fourth, it argues a genuine issue of material fact exists regarding whether the State acted negligently in failing to supervise and monitor Cubbage. Lastly, it

argues the district court erred in granting the motion for summary judgment when a motion to compel was pending.

**A. Whether the District Court Erred in Finding as a Matter of Law that the State Owed No Duty of Care to the Care Center.** The crux of the care center's argument on this issue is that because the State had a special relationship with Cubbage, the State had a common law duty to accurately warn the care center of Cubbage's dangerous propensities. First, we doubt this issue is preserved. Although raised in its petition, the care center did not argue this issue in its resistance to the State's motion for summary judgment. Thus, we do not believe the district court considered the issue or ruled upon it.

Moreover, in its brief, the care center relies on the "Duty to Third Parties Based on Special Relationship with Person Posing Risks" now contained in section 41 of the Restatement (Third) to support its argument. Factually, section 41(b)(2) of the Restatement (Third) appears to support the care center's argument because the representations made by the State to the care center were made while Cubbage was in the State's custody. However, we need not decide if section 41(b)(2) is applicable to the care center's claim because at the time any representations were made, the State could not release Cubbage from its custody, only a court could.

As we previously found, a special relationship does not exist between the State and Cubbage when the courts discharged him from CCUSO and committed him to the care center. The courts made the decision to discharge Cubbage, not the State. Thus, even if the care center had preserved this issue, it is without merit.

**B. Whether a Genuine Issue of Material Fact Exists Regarding Whether the State Acted Negligently in Discharging Cubbage from**

**CCUSO.** The care center preserved this issue. However, the undisputed facts show the court made the final decision to discharge Cubbage. The court was not required to discharge him. Again, our courts are not rubber stamps, but they are deliberative bodies making decisions based upon the evidence before them. The care center cites no authority requiring the State to present its case to the court differently at the discharge hearing. Thus, the district court was correct in finding no duty, and therefore, no genuine issue of material fact exists on this issue.

**C. Whether a Genuine Issue of Material Fact Exists Regarding Whether the State Acted Negligently in Performing Its Role in the Civil Commitment of Cubbage to the Pomeroy Care Center Under Iowa Code Chapter 229.** The same reasoning and logic applies to this argument as we applied to the issue concerning whether the State acted negligently in discharging Cubbage from CCUSO. Thus, the district court was correct in finding no duty; therefore, no genuine issue of material fact exists on this issue.

**D. Whether a Genuine Issue of Material Fact Exists Regarding Whether the State Acted Negligently in Failing to Supervise and Monitor Cubbage.** The resolution of this issue depends on the applicability of the "Duty to Third Parties Based on Special Relationship with Person Posing Risks" now contained in section 41 of the Restatement (Third). As we previously found, the district court discharged Cubbage, not the State. Therefore, the State has no duty based upon a special relationship. Thus, the district court was correct in finding no duty; therefore, no genuine issue of material fact exists on this issue.

**E. Whether the District Court Erred in Granting the Motion for Summary Judgment When a Motion to Compel Was Pending.** We agree with the court of appeals that we need not reach this issue having found no duty existed between the State and the care center.

**F. Conclusion.** For all the reasons stated above, we find the district court was correct in granting the State's motion for summary judgment against the care center.

**V. Disposition.**

We find under the issues preserved that no duty existed as a matter of law between the State and Gottschalk or the State and the Pomeroy Care Center. Accordingly, we affirm the decisions of the court of appeals and the district court.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Cady, C.J., and Appel, J., join this opinion. Waterman and Mansfield, JJ., join this opinion but also concur specially. Hecht, J., files a dissent in which Zager, J., joins. Zager, J., files a separate dissent in which Hecht, J., joins.

**WATERMAN**, **Justice (concurring specially).**

I respectfully concur in the majority opinion. I write separately to set forth my view that the claims against the State fail on several legal grounds not reached by the majority. Because the facts of this case cry out for a remedy, I begin by noting this appeal resolves only those claims by the plaintiffs and the nursing home *against the State of Iowa.* The plaintiffs will get their day in court on their tort claims against the nursing home operator, Pomeroy Development, Inc., which chose to accept a known sex offender as an in-patient resident and allegedly failed to properly monitor him to protect its vulnerable, elderly residents, including Mercedes Gottschalk.

In my view, the State's tort duty ended upon William Cubbage's unconditional release from its custody and transfer to the nursing home. Upon that transfer, Cubbage became Pomeroy's responsibility. "Liability follows control . . . ." *Estate of McFarlin v. State,* 881 N.W.2d 51, 64 (Iowa 2016). A party in control can take precautions to reduce the risk of harm to others. *See McCormick v. Nikkel & Assocs., Inc.,* 819 N.W.2d 368, 374 (Iowa 2012) ("The reason is simple: The party in control . . . is best positioned to take precautions to identify risks and take measures to improve safety."). Section 41 of the Restatement (Third) of Torts: Liability for Physical & Emotional Harm, is directly on point and provides,

> (a) An actor in a special relationship with another owes a duty of reasonable care to third parties with regard to risks posed by the other that arise within the scope of the relationship.

> (b) Special relationships giving rise to the duty provided in Subsection (a) include:

> . . . .

(2)  a custodian with those in its custody[.]

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 41 (Am. Law Inst. 2012) [hereinafter Reinstatement (Third)].  The comment accompanying that section, entitled "Duty of custodians," further explains,

> Custodians of those who pose risks to others have long owed a duty of reasonable care to prevent the person in custody from harming others.  *The classic custodian under this Section is a jailer of a dangerous criminal.*  Other well-established custodial relationships include hospitals for the mentally ill and for those with contagious diseases. Custodial relationships imposing a duty of care are limited to those relationships that exist, in significant part, for the protection of others from risks posed by the person in custody.  *The duty of care is limited to the period of actual custody.*

*Id.* § 41 cmt. *f*, at 67 (emphasis added).  This bright-line rule is clear, easy to apply, and consistent with Iowa caselaw.  As the court of appeals correctly concluded,

> [U]pon the unconditional discharge of Cubbage from the CCUSO—a decision made by the district court—the special relationship between the State and Cubbage ended.  *See* Iowa Code § 229A.2(4) (" 'Discharge' means an unconditional discharge from the sexually violent predator program.  A person released from a secure facility into a transitional release program or released with or without supervision is not considered to be discharged.").  After the district court issued the discharge order, the State had no ongoing obligation to monitor or supervise Cubbage.

(Footnote omitted.)  The district court applied the same analysis in entering summary judgment for the State.  Once an inmate obtains his or her release from incarceration, the state is no longer subject to a tort-law duty for harm the former inmate inflicts on another person.  This no-duty rule is not based on foreseeability of harm, but rather reflects a policy choice, making tradeoffs between the goals of deterrence and victim compensation and the costs of imposing liability.

Foreseeability alone is insufficient to create a duty in tort for the misconduct of others. *See Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009) (removing foreseeability from duty analysis). Many inmates who serve their time or otherwise win release from jail or prison—or in this case, the State's civil commitment unit for sexual offenders (CCUSO)—foreseeably commit more crimes. *See Binschus v. State*, 380 P.3d 468, 581 (Wash. 2016) (en banc) (recognizing recidivism rate is over fifty percent and therefore "one could argue that in almost any case, it is foreseeable that an inmate may commit another crime after release"). But we have never imposed civil liability on the state for crimes a person commits after release from custody. As the drafter's comment recognizes, imposing such tort liability would have a chilling effect on parole or bail determinations for pretrial release:

> Courts have been reluctant to impose a duty on actors who make discretionary determinations about parole or prerelease programs, even though these decisions arise in a custodial relationship. Imposing such a duty, thereby creating concern about potential liability, might detrimentally affect the decisionmaking of parole boards and others making similar determinations.

Restatement (Third) § 41 cmt. *f*, at 67–68.

We reached the same conclusion in *Leonard v. State* and rejected "the potential for limitless liability" by the state for harm to persons attacked by a former custodial patient. 491 N.W.2d 508, 512 (Iowa 1992). In *Leonard*, a state mental hospital discharged a patient, Henry Parrish, to outpatient care after treating him for bipolar disorder. *Id.* at 509–10. Shortly after his release, Parrish severely beat a coworker, John Leonard, without provocation. *Id.* at 510. Leonard sued the state. *Id.* We held as a matter of law the treating psychiatrist employed by the state owed no duty to Leonard, a member of the general public. *Id.* at

512. We concluded the "risks to the general public posed by the negligent release of dangerous mental patients would be far outweighed by the disservice to the general public if treating physicians were subject to civil liability for discharge decisions." *Id.* We feared that "[t]he treating physician would indulge every presumption in favor of further restraint, out of fear of being sued." *Id.* (quoting *Sherrill v. Wilson*, 653 S.W.2d 661, 664 (Mo. 1983) (en banc)).

Today's case is an even stronger one for a no-duty analysis. The district court not only ordered Cubbage's release, but also approved the plan whereby he would be transferred to Pomeroy. *See* Iowa Code § 229A.10 (2011) (providing that a petition for discharge must be authorized by the court); *id.* § 229.13(1)(*b*) (allowing court to place individual with "serious mental impairment" under care of appropriate hospital or facility for treatment).

Other courts have held the government is not liable in tort after an inmate's release from incarceration, even when it is foreseeable he will reoffend. In *Binschus*, a former inmate fatally shot six strangers and injured four others in a psychotic episode several months after his unconditional release from a county jail. 380 P.3d at 470. Civil actions were filed against the county, alleging it negligently failed to diagnose and treat his dangerous condition before releasing him. *Id.* The trial court granted the county's motion for summary judgment based on lack of duty and proximate cause. *Id.* The Washington Supreme Court affirmed, holding the county owed no duty to the plaintiffs after the inmate's release from jail. *Id.* at 472 (noting "[t]he practical implications of imposing such a broad duty on jails [would be] striking"); *see also Fryman v. Harrison*, 896 S.W.2d 908, 910 (Ky. 1995) (holding jailer "cannot be held individually responsible for the criminal acts of an

inmate" after release from custody), *modified by Gaither v. Justice & Pub. Safety Cabinet*, 447 S.W.3d 628, 638 (Ky. 2014); *Holloway v. State*, 875 N.W.2d 435, 447 (Neb. 2016) (holding state was not liable in tort for crimes of former inmate because it lacked control "after he was released"); *cf. Wells v. Walker*, 671 F. Supp. 624, 627 (E.D. Ark. 1987) (dismissing crime victim's § 1983 claim because prison officials owed "no constitutionally mandated duty to protect private citizens [after inmate] was freed"), *aff'd*, 852 F.2d 368 (8th Cir. 1988).

Cubbage was not under state supervision when he assaulted Mercedes Gottschalk. Indeed, courts in most states, including Iowa, reject governmental tort liability even for crimes committed by parolees or probationers who are under state supervision. *Fitzpatrick v. State*, 439 N.W.2d 663, 667–68 (Iowa 1989) (affirming dismissal of tort claim against parole officer by victim shot by parolee); *Bartunek v. State*, 666 N.W.2d 435, 442 (Neb. 2003) (collecting cases). These courts decline to find a duty because "[t]he level of control afforded to a parole or probation officer is not such that an officer . . . 'takes charge of a third person,'" given that the parolee or probationer is "generally free to conduct his or her day-to-day affairs." *Bartunek*, 666 N.W.2d at 442. Courts note that imposing tort liability on government defendants for crimes committed by offenders under supervision would result in continued detentions and discourage parole, probation, or pretrial release. *Compare Sorge v. State*, 762 A.2d 816, 821–22 (Vt. 2000) (declining to impose tort duty on state for juvenile in custody and collecting cases), *with Leonard*, 491 N.W.2d at 512 (noting that imposing liability on therapist for patient's postrelease assault would cause doctors to overrestrain patients). If the State is not liable in tort for

crimes committed by an offender released under supervision, it cannot be liable in tort after an unconditional release.

Cubbage made no threats against Mercedes Gottschalk or any other Pomeroy resident while he was in state custody at CCUSO. He had never met her. This case is distinguishable from those imposing a duty for failing to take action when an inmate or patient in custody names someone he overtly threatens to harm upon his release. *See, e.g.,* *Tarasoff v. Regents of Univ. of Cal.,* 551 P.2d 334, 343 (Cal. 1976) (imposing liability on state when patient in custody confided in state-employed therapist that he intended to kill Tatania Tarasoff and made good on his threat after his release from hospital). Generalized threats while in custody are insufficient to create a duty to warn. Four years after deciding *Tarasoff,* the California Supreme Court addressed

> the propriety of imposing on those responsible for releasing or confining criminal offenders a duty to warn of the release of a potentially dangerous offender who . . . has made a generalized threat to a segment of the population.

*Thompson v. County of Alameda*, 614 P.2d 728, 733 (Cal. 1980). While in a county jail, an inmate threatened to "take the life of a young child residing in the neighborhood" without naming any child. *Id.* at 730. The jailers released him into the temporary custody of his mother without warning her or other parents in the neighborhood of his threat. *Id.* Within twenty-four hours, he killed a young child who lived a few doors away. *Id.* The parents sued the county, alleging it breached a duty to warn parents in the neighborhood. *Id.* The trial court dismissed the lawsuit, and the California Supreme Court affirmed, holding such a generalized threat did not support a duty to warn. *Id.* at 730, 738. The court declined to impose "blanket liability" on the county for failing to warn neighborhood parents or the offender's mother of his dangerous

tendencies upon his supervised release. *Id.* at 734. The court distinguished *Tarasoff* because neither "a direct or continuing relationship between" the parties and the county existed, nor was the victim a "foreseeable or readily identifiable target" when the offender made merely a generalized threat. *Id.* The court noted requiring the county to warn the public would "jeopardize rehabilitative efforts" of programs like parole and probation because "authorities would be far less likely to authorize release given the substantial drain on their resources which such warnings might require." *Id.* at 737. Additionally, the court declined to impose a duty to warn the offender's mother, his custodian, noting she had been "aware of her son's incarceration for the previous 18 months." *Id.*

I see a parallel between these cases. Pomeroy was aware of Cubbage's incarceration and crimes when it received him into its care. Any warning would have been inherently generalized in nature, given that Cubbage did not make threats toward any Pomeroy resident—either generally or specifically—before his unconditional discharge from state custody.

There is another bar to recovery against the State—the common law public-duty doctrine.[3] In *Estate of McFarlin*, we applied the public-duty doctrine to affirm a summary judgment motion dismissing tort claims against the state in a wrongful-death action arising out of a boating accident on a state-owned lake, a confined area. 881 N.W.2d at

---

[3]The district court and court of appeals did not reach the public-duty doctrine, but the State included the doctrine in its motion for summary judgment and appellate briefs as an alternative ground for dismissal. "We will consider an alternative ground raised in the district court and urged on appeal even though the district court [did] not . . . rule on the alternative ground." *Hawkeye Foodserv. Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 610 (Iowa 2012).

64. We noted the applicability of the public-duty doctrine under the Third Restatement:

> In *Thompson v. Kaczinski,* we adopted section 7 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. The reporter's note to section 7 acknowledges the continued vitality of the public-duty doctrine:
>
>> *Deference to discretionary decisions of another branch of government.* The "public-duty" doctrine is often explained as preventing government tort liability for obligations owed generally to the public, such as providing fire or police protection. Only when the duty is narrowed to the injured victim or a prescribed class of persons does a tort duty exist.
>
> Section 37 provides that "[a]n actor whose conduct has not created a risk of physical . . . harm to another has no duty of care to the other unless a court determines that one of the affirmative duties provided in §§ 38–44 is applicable." Section 40, entitled "Duty Based on Special Relationship with Another" provides that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." We conclude the public-duty doctrine remains good law after our adoption of sections of the Restatement (Third) of Torts.

*Id.* at 59–60 (alterations in original) (footnote omitted) (citation omitted) (first quoting Restatement (Third) § 7, reporter's note cmt. *g*, at 93–94 (Am. Law Inst. 2010); then quoting *id.* § 37, at 2; and then quoting *id.* § 40(a), at 37). Earlier cases, which remain good law, applied the public-duty doctrine to dismiss tort claims brought by persons injured by someone the police released from custody or failed to detain or monitor. *See Fitzpatrick*, 439 N.W.2d at 667–68; *Hildenbrand v. Cox*, 369 N.W.2d 411, 414–16 (Iowa 1985) (affirming summary judgment dismissing tort claim by estate of drunk driver who died in accident shortly after police questioned but failed to arrest him following his collision with a planter on the town square); *see also Kolbe v. State*, 625 N.W.2d 721, 729–30 (Iowa 2001) (holding public-duty doctrine barred tort claim by victim of

visually impaired driver to whom the state carelessly issued a driver's license); *Sankey v. Richenberger*, 456 N.W.2d 206, 208–09 (Iowa 1990) (dismissing tort claims against police chief by victims shot at city council meeting chief attended). The plaintiffs and Pomeroy fail to cite a case from any jurisdiction imposing tort liability on a state or local government for the acts of a former patient or inmate after his or her unconditional release from custody. If we allowed the claimants in today's case to recover against the State, it would be difficult to set a limiting principle on the scope of governmental liability for third-party criminal conduct.

The district court and court of appeals determined the State was entitled to summary judgment against Pomeroy based on the State's statutory immunity under Iowa Code section 669.14(4).[4] Our court's majority did not need to reach that issue or the public-duty doctrine after affirming summary judgment on other grounds. I mention that immunity and the public-duty doctrine as additional reasons the analysis in the dissenting opinions fails to salvage the claims against the State.

For all these reasons, I concur in the majority's opinion affirming the decision of the court of appeals and district court's summary judgment.

Mansfield, J., joins this special concurrence.

---

[4]The district court granted the State's motion for summary judgment on Pomeroy's negligent misrepresentation claim based on Iowa Code section 669.14(4). Pomeroy did not challenge that ruling on appeal, and the court of appeals affirmed the district court for that reason.

#14–1326, *Estate of Mercedes Gottschalk v. Pomeroy Dev., Inc.*

**HECHT, Justice (dissenting).**

I cannot agree with the duty analysis undertaken by the majority, and I therefore respectfully dissent. The summary judgment record leaves little doubt that William Cubbage was a highly dangerous sexually violent predator (SVP) with a substantial likelihood of reoffending when he was committed to the civil commitment unit for sexual offenders (CCUSO). Cubbage had not made progress in the CCUSO treatment program prior to his release into a small-town nursing home, and CCUSO administrators believed he continued to present a danger to himself and others such that he must continue to be involuntarily detained. Although Alzheimer's-related dementia was a factor motivating the CCUSO administrators' decision to transfer him out of the SVP-treatment program, our duty analysis cannot overlook the fact that Cubbage was an unsuccessfully treated sexual predator at the time the transfer plan was formulated and implemented by the department of human services (DHS), representatives of the attorney general's office, and representatives of the Iowa public defender's office. Summary judgment should not have been granted.

## I. Additional Background Facts and Proceedings.

I begin with evidence in the summary judgment record that informs my analysis. Cubbage was adjudicated an SVP in 2002 and committed to CCUSO at the age of seventy-one. Considerable evidence supported his adjudication, including four convictions for sexual misconduct perpetrated against children. The convictions in 1987 (lascivious acts), 1991 (indecent contact with a child), 1997 (indecent contact with a child), and 2000 (assault with intent to commit sexual abuse) demonstrate that Cubbage is undoubtedly a member of what our

legislature has described as a "small but extremely dangerous group" of persons whose "likelihood of engaging in repeat acts of predatory sexual violence is high." Iowa Code § 229A.1 (2011).

In his initial commitment evaluation at CCUSO in 2002, Cubbage scored at high risk to reoffend on two actuarial assessments. The evaluator concluded Cubbage was "a menace to the health and safety of others" if "not confined in a secure facility, as a defined by Chapter 229A." The mental abnormality supporting Cubbage's classification as a predator was a personality disorder with antisocial and narcissistic features causing him to engage in sexually aggressive behavior.

In enacting chapter 229A, our legislature observed that SVPs tend to have "antisocial personality features" requiring "very long-term" treatment using rehabilitation modalities that are different from those utilized in treating mentally ill persons committed involuntarily under chapter 229. *Id.* The summary judgment record reveals Cubbage was resistant to treatment at CCUSO. In fact, he stopped participating altogether in treatment sometime in 2005. By the time of his final CCUSO annual evaluation in July 2010, Cubbage "continu[ed] to display dynamic risk factors that result in him being likely to engage in predatory acts constituting sexually violent offenses if discharged." Notably, the report generated as part of the 2010 evaluation concluded Cubbage—then age eighty-one—had not shown a change in the mental abnormality that led to his SVP commitment. For that reason, the evaluator who authored the 2010 report found Cubbage was not ready for transitional release under chapter 229A because he failed to meet five of the ten criteria governing eligibility for transitional placement. *See id.* § 229A.8A.

In particular, Cubbage was ineligible for transitional placement because he had not yet achieved and demonstrated significant insights into his sex offending cycle, he had not accepted responsibility for his past behavior or understood the impact of sexually violent crimes on victims, and he had a major discipline report in June 2010 for disrespect and sexual behavior. *See id.*

Notwithstanding Cubbage's unsuccessful course of treatment during eight years of detention as an SVP, his persisting mental abnormality, and his failure to meet the criteria for transitional release, the evaluator opined that "the dynamics involved which have determined Mr. Cubbage [is] more likely than not to re-offend in a sexually violent manner have changed." The evaluator's report opaquely concluded Cubbage "does not appear to meet the threshold of [an SVP] as defined in Chapter 229A and currently would be more appropriately characterized as a person who has committed sexual offenses in the past and may be suffering from early stages of dementia."[5]

CCUSO administrators decided to transfer Cubbage out of the program. In furtherance of the transfer plan, civil commitment proceedings were commenced against Cubbage in the district court for Cherokee County under chapter 229. The State's petition alleged Cubbage was a danger to himself and others due to his dementia and executive dysfunction. At that time, Cubbage was a sexual predator who

---

[5]The report thus appears to be internally inconsistent. On the one hand, it discloses Cubbage continues to present a risk to reoffend; on the other hand, the report suggests Cubbage "does not appear" to meet the threshold of an SVP. The report noted that Cubbage appeared to be "less able to participate due to his cognitive impairments and other medical conditions." The record does not reveal the extent or severity of Cubbage's cognitive impairments as they may have existed in July 2010 or thereafter; nor does it explain why an SVP with dementia would be less dangerous to others than an SVP without dementia.

had not been successfully treated at CCUSO for the attributes that made him dangerous to others.

On November 16, 2010, the district court for Cherokee County entered an order for hospitalization that directed Cubbage be placed in the Pomeroy Care Center for treatment. On November 24, 2010, the execution of the State's plan to move Cubbage out of CCUSO—the institution created for the express purpose of detaining sexual predators—moved quickly forward. On that day, a motion to discharge Cubbage from his commitment to CCUSO under chapter 229A was filed in Des Moines County district court. The motion advised the court of a mutual agreement between the director of DHS and representatives of the Iowa attorney general's office and the Iowa public defender's office that Cubbage "is unable to obtain any further gains from his civil commitment at CCUSO"[6] and is "seriously mentally impaired and in need of full-time custody and care."

The motion to discharge Cubbage notably failed to inform the district court that he had been unsuccessfully treated for the mental abnormality predisposing him to commit sexually violent offenses. Hearing no resistance to the transfer orchestrated by the State, the district court entered an order that same day implementing the stipulated plan discharging Cubbage from commitment under chapter 229A and committing him to the Pomeroy Care Center under chapter 229.

---

[6]Because the record reveals Cubbage had been uncooperative in the treatment process since at least 2005 and his mental abnormality making him likely to reoffend remained as of July 2010, it is unclear to me what "gains" Cubbage had achieved while at CCUSO.

As the majority has accurately detailed, Cubbage allegedly had nonconsensual sexual contact with Gottschalk, a patient at the Pomeroy Care Center in August 2011. Gottschalk filed a claim with the state appeal board asserting DHS was negligent in failing to (1) prepare and provide a discharge safety plan for Cubbage, (2) follow up with the Pomeroy Care Center to assure Cubbage was properly restrained and/or supervised there, and (3) warn the residents of the Pomeroy Care Center that a sexual deviant was living among them. This action was subsequently commenced by Gottschalk's estate against Pomeroy Care Center and the State.

The State filed a motion for summary judgment asserting it owed no duty to Gottschalk under either Iowa Code chapter 229 or 229A after Cubbage's discharge from CCUSO. The district court granted the State's summary judgment motion, concluding the State owed no duty to Gottschalk after Cubbage was unconditionally discharged from CCUSO.

## II. The Duty Analysis.

I agree with the majority's conclusion that the issue of whether the State owed a duty to warn Gottschalk of the risk of physical harm posed to her by her exposure to Cubbage—an unsuccessfully treated SVP—was preserved for our review. The theory of liability based upon the State's failure to warn Gottschalk was asserted in Gottschalk's appeal board claim and in the plaintiff's resistance to the State's motion for summary judgment. Although the district court's summary judgment ruling made no reference to warning, I conclude this theory of liability was clearly before the district court. Because the ruling was based on the proposition that the 2010 order discharging Cubbage from CCUSO terminated any responsibility of the State for Cubbage's postdischarge conduct as a matter of law, a motion under Iowa Rule of Civil Procedure

1.904(2) requesting the district court to expressly rule on whether the State owed a duty to warn Gottschalk about the risk of her exposure to Cubbage at the Pomeroy Care Center would have been pointless. Thus, like the majority, I conclude we should address whether the State owed a duty to warn Gottschalk of the risk of physical harm posed to her by Cubbage.

Unlike the majority, however, I conclude the State owed a duty to warn Gottschalk. An actor ordinarily owes a duty to exercise reasonable care when the actor's own conduct creates a risk of physical harm. *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009). As we noted in *Thompson*, this general duty is explained in section 7 of the Restatement (Third) of Torts. *Id.* (citing Restatement (Third) of Torts: Liab. for Physical Harm § 7, at 90 (Am. Law Inst., Proposed Final Draft No. 1, 2005)). However, the majority has chosen to view the physical and emotional harm claimed by the plaintiff in this case as harm allegedly caused exclusively by Cubbage—not the conduct of state actors. Accordingly, the court's analysis of the duty issue is not based on the general duty principles under section 7 of the Restatement (Third).[7]

---

[7]Although the majority has addressed the State's liability under the rubric of special relationship, I would leave room for the possibility that the State's conduct in this case directly caused a risk of physical harm to Gottschalk by transferring Cubbage—an unsuccessfully treated SVP—to the Pomeroy Care Center. *See* Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37 cmt. *d*, at 4–5 (Am. Law Inst. 2012) (noting that "an actor's conduct may increase the natural or third-party risk" and thereby "creates risks of its own"). A reasonable fact finder could find that the State's transfer of Cubbage to a target-rich nursing home environment that lacked CCUSO-like security substantially increased the risk that Cubbage would offend if reasonable warnings were not given to those exposed to the risk at the care center. Such risk-creating conduct is governed by the ordinary duty of reasonable care addressed in section 7 of the Restatement (Third). *Id.* § 7, at 77 (Am. Law Inst. 2010). Because the majority has addressed the State's liability in this case under the rubric of special relationship, however, I will similarly focus my analysis there as well. I would, however, reach the same result under a section 7 duty analysis.

The proposition that an actor generally owes no duty of care with respect to risks of physical harm created by another is expressed in section 37 of the Restatement (Third). Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 37, at 2 (Am. Law Inst. 2012). This proposition constitutes a no-duty rule based on policy. *Id.* § 37 cmt. *b,* at 5. There are exceptions to this no-duty rule, however. In some circumstances, the common law imposes an affirmative "duty to take action to prevent or ameliorate the risk of harm created by others." *Id.* For example, "[a]n actor in a special relationship with another owes a duty of reasonable care to third persons with regard to risks posed by the other that arise within the scope of the relationship." *Id.* § 41(a), at 64–65. Section 41 lists several special relationships giving rise to a duty of reasonable care: a parent with children, a custodian with those in its custody, an employer with employees when the employment facilitates harm to third parties, and mental-health professionals with patients. *Id.* § 41(b). This list of special relationships supporting the existence of a duty is not exclusive. *Id.* § 41 cmt. *i,* at 73.[8]

I would hold in this case that a special relationship existed between the State and Cubbage supporting the imposition of a duty to warn Gottschalk. The relationship between CCUSO and Cubbage is closely analogous to a mental-health professional–patient relationship. *See id.* § 41(b), at 65. Obvious and compelling policy reasons support

---

[8]Similarly, comment *b* to section 37 of the Restatement (Third) explains that

the affirmative duties identified in [Chapter 7 of the Restatement (Third) of Torts] are not an exclusive list; courts may identify additional areas for affirmative duties in the future, just as courts may decide, for reasons of policy or principle, that additional no-duty rules should be recognized.

Restatement (Third) of Torts: Liab. for Emotional & Physical Harm § 37 cmt. *b,* at 3.

the imposition of a duty of care on the State as it transferred an unsuccessfully treated—and therefore dangerous—sexual predator to a nursing home populated by a finite number of especially vulnerable residents. A reasonable fact finder could find on this record that Cubbage was an SVP whose persistent mental abnormality rendered him likely to reoffend sexually before and after the transfer to Pomeroy Care Center. He had been resistant to treatment at CCUSO during the five years prior to his discharge, and the evidence tending to prove he had not been meaningfully rehabilitated during his detention is overwhelming.

The duty I would recognize in this case is distinguishable from the one claimed but rejected by this court in L*eonard v. State,* 491 N.W.2d 508 (Iowa 1992). In *Leonard,* we held a state-employed psychiatrist who discharged a patient from a mental-health institute owed no duty to a person subsequently injured by the patient. *Id.* at 512. We reasoned that a no-duty rule was justified in that case because the plaintiff was a member of the public at large—not a reasonably foreseeable victim of the patient's dangerous and violent tendencies. *Id.* at 511–12. In this case, Gottschalk was not merely a member of the public at large. A reasonable fact finder could find she was among the discrete universe of known Pomeroy Care Center residents who would foreseeably be exposed to Cubbage's predatory behavior.

The majority nonetheless affirms the no-duty rule applied by the district court in this case because the State obtained a discharge order from the district court prior to Cubbage's transfer to the Pomeroy Care Center. I am not persuaded. The motion for discharge was presented to the district court in the form of a stipulated proposed disposition. Although the resulting order discharging Cubbage from CCUSO was

clearly binding on the parties who were before the court stipulating to the proposed discharge, we should not conclude it absolved the State of a duty of care to Gottschalk under the extraordinary circumstances presented here.

We should not view the court order effectuating the stipulated discharge of Cubbage from CCUSO as an immunity-creating device for the State. I am not prepared to accept the notion that the district court for Des Moines County viewed the discharge order as adjudication of the nature and extent of the risk created by Cubbage upon discharge. The order was instead a procedural device allowing the parties before the court to change the location of Cubbage's placement by agreement. No one appeared before the court opposing the transfer. No one appeared voicing caution about the grave risk that would be created by discharging Cubbage from CCUSO and transferring him to a nursing home.

The administrators of CCUSO wanted to move Cubbage out because he was resistant to SVP treatment and suffered from dementia; the Pomeroy Care Center had an interest in filling a bed; and Cubbage had no reason to oppose the move to a less-restrictive environment in the nursing home. These are not circumstances engendering a legitimate policy-based no-duty rule for a class of cases. On the contrary, they are circumstances crying out for the imposition of a duty of reasonable care under our tort law. I would therefore reverse the summary judgment and remand for further proceedings in the district court.

Zager, J., joins this dissent.

**ZAGER, Justice (dissenting).**

I join the well-reasoned dissent by Justice Hecht. I agree that the unique facts of this case do not lend themselves to a determination by means of summary judgment. Rather, I believe there are sufficient factual issues involved in this case for the State to have assumed a general, and perhaps a special, duty of care to the plaintiff.

It is important to look at the factual scenario that played out in this case and compare it to the legislative mandates. Cubbage was sentenced to several terms of imprisonment. Rather than release Cubbage from State custody following his latest prison sentence, the State elected to commence civil commitment proceedings to have Cubbage adjudicated a sexually violent predator. *See* Iowa Code § 229A.4 (2011). This was based on his lifetime of sexual offenses, many of them against children. As noted, Cubbage was clearly one of a "small but extremely dangerous group" of persons whose "likelihood of engaging in repeat acts of predatory sexual violence is high." *Id.* § 229A.1.

Several legislative findings are also significant when discussing the sexually violent predator (SVP) statutes. First, SVPs are not meant to be treated under Iowa Code chapter 229. *Compare id.* §§ 229.1A, .6, *with id.* § 229A.1 ("In contrast to persons appropriate for civil commitment under chapter 229, sexually violent predators generally have antisocial personality features that are unamenable to existing mental illness treatment."). Chapter 229 is intended to provide treatment to persons with serious mental disorders and then return them to the community. *Id.* § 229.15 (outlining procedure for periodic reports of individuals hospitalized under chapter 229). Second,

> [t]he general assembly finds that sexually violent predators'
> likelihood of engaging in repeat acts of predatory sexual

> violence is high and that the involuntary commitment procedure under chapter 229 is inadequate to address the risk these sexually violent predators pose to society.

*Id.* § 229A.1. Last, there are several other references in the legislative findings of the SVP statute regarding "public safety concerns" and "the need to protect the public." *Id.*

However, adjudicating an individual as an SVP under our statutes is not quick or easy, nor should it be. At the beginning of the proceedings, Cubbage received the right to appointed counsel and the right to retain experts. *Id.* § 229A.6(1)–(2). The Iowa Rules of Evidence applied to the hearing, as well as the Iowa Rules of Civil Procedure. *Id.* § 229A.7(4). Cubbage was entitled to a full trial to either a judge or a jury. *Id.* The State had the burden of proving beyond a reasonable doubt that Cubbage was an SVP. *Id.* § 229A.7(5). The State felt compelled to bring this action and was successful in meeting its burden. Cubbage was "committed to the custody of the director of the department of human services for control, care, and treatment until such time as [his] mental abnormality has so changed that [he] is safe to be placed in a transitional release program or discharged." *Id.* § 229A.7(5)(*b*). Cubbage was civilly committed to the Civil Commitment Unit for Sex Offenders (CCUSO) in May 2002.

To say that Cubbage's progress in treatment at CCUSO as a violent sexual predator was abysmal is an understatement. It is only necessary to refer to the most recent annual report for Cubbage prior to his discharge, dated July 13, 2010, to confirm these facts. Cubbage chose not to be interviewed for the annual evaluation. Cubbage had not actively participated in treatment programming since 2005. Cubbage did not meet the criteria for the transitional release program as (1) there was no change in his mental abnormality, and (2) he did not meet five of the

ten statutory criteria for transitional release.  *See id.* § 229A.8A(2)–(3).
The psychologist's evaluation was that Cubbage "continues to display
dynamic risk factors that result in him being likely to engage in
predatory acts constituting sexually violent offenses if discharged."  The
most recent annual report disclosed that on June 10, 2010, and again on
June 29, Cubbage received behavioral incident reports for disrespect and
sexual behavior, with the second incident classified as a "major incident
report."  However, because of a diagnosis of early-onset Alzheimer's, and
a vague reference to a lack of executive cognitive ability, the State
deemed Cubbage appropriate for unconditional discharge from CCUSO to
the Pomeroy Care Center.  *See id.* § 229A.10 (outlining the procedure for
a petition for discharge from secure confinement).

With this history in mind, I agree with and endorse Justice Hecht's
duty analysis and would find, at a minimum, that a special relationship
existed between the State and Cubbage to support the imposition of a
duty to warn Gottschalk.  It is unnecessary for me to repeat this duty
analysis here.  Suffice that I would also reject the no-duty rule applied by
the district court.

What prompts me to write separately is the summary and
perfunctory fashion in which the State orchestrated the discharge of an
obviously dangerous sexual predator from CCUSO and then facilitated
his placement in a nursing home among a highly vulnerable population.
This is troubling to me on many levels, both legally and factually.  The
State of Iowa has been responsible for the care, custody, and control of
Cubbage for decades, either in the prison system or based on his
commitment as an SVP.  The State expended great time and expense to
civilly commit Cubbage and thereafter to keep him confined.  The need
for this commitment clearly continued up to the date of his unconditional

discharge from CCUSO. This commitment was to continue until "[his] mental abnormality has so changed that [he] is safe to be placed in the transitional release program or discharged." *Id.* § 229A.7(5). As reflected in his records and evaluations, Cubbage's mental abnormality had not changed prior to the time of his unconditional discharge. Likewise, the latest psychological evaluation of Cubbage resulted in an opinion that Cubbage "continues to display dynamic risk factors that result in him being likely to engage in predatory acts constituting sexually violent offenses if discharged." This conclusion is clearly supported by the two very recent incidents of sexual behavior. Under what possible circumstances would the State ever consider recommending that Cubbage was suitable for unconditional discharge?

The answer is that in May 2010, discussions began about how the State could remove Cubbage from his commitment at CCUSO "pending DHS Director's approval." Then, perhaps not surprisingly, the July 2010 annual report concluded that Cubbage "does not currently meet the definition of a sexually violent predator as described in 229A." Based on all the information described above, this conclusion lacks any credibility in law or fact. But by this time, the decision had apparently been made to find another placement for Cubbage; the only question was how the State would accomplish this goal.

Anyone who is familiar with the SVP statutes and our accompanying caselaw can appreciate just how difficult it is for an individual to either transition from CCUSO or be discharged. Any decision for either transition or discharge should be well-informed and meet the strict standards as provided in the statute. *See id.* §§ 229A.8A, .9A, .10. In other words, the discharge of a sexually violent predator should be tested by the law and the facts, and not as a mere

accommodation to the State which simply no longer wants to incur the time, expense, or inconvenience that is involved with the care, custody, and control of this SVP. Of utmost importance, any decision involving the unconditional discharge of an SVP must involve an analysis of the effect of the decision on public safety. No critical analysis or testing was even attempted here. Instead, the motion for discharge was presented to the district court as a stipulated proposed disposition. There was no record, no evidence, and no discussion. What is also important to note is that there are a number of alternatives provided for in the statute that do not involve the unconditional discharge of a civilly committed SVP. *See id.* §§ 229A.8A, .9A. Instead of even considering these alternatives, or advising the district court of these various placements, the State simply recommended an unconditional discharge of Cubbage. Then to compound matters, the State agreed to a long-term mental health commitment for Cubbage, a placement which is clearly inappropriate for a person with Cubbage's background.

With this procedural background, the State now argues it is insulated from any duty it might have had, and any corresponding liability, because it no longer has care, custody, and control over Cubbage. It also relies on the argument that a district court judge approved the order of discharge for Cubbage and a different district court judge approved the mental health commitment order for Cubbage. I cannot agree that the fact that the orders were approved by a district court judge somehow allows the State to avoid the duty to act reasonably to protect the vulnerable nursing home residents who would be exposed to Cubbage as a consequence of the discharge and transfer arrangement. The State had the care, custody, and control over Cubbage for decades. When it no longer wanted this responsibility, regardless of the obvious

risks it posed to public safety, it attempted to use the court system to absolve itself of all further responsibility and liability. This is unconscionable. Unfortunately, this is not the only context in which the State attempts to insulate itself from liability when it decides that it no longer wants to provide for the care, custody, and control over individuals it has historically assumed responsibility for, and to whom it now decides it no longer wants this obligation. Our court system has been used in similar situations involving our mentally ill citizens and our mental health institutes. While it is clearly within the State's prerogative to take such actions as it deems appropriate, it should also understand that there is a concomitant duty of reasonable care under our tort law. Likewise, I think it is incumbent upon our judicial officers to more closely examine scenarios like the facts and circumstances presented here. I would reverse the district court grant of summary judgment to the State and remand for further proceedings.

Hecht, J., joins this dissent.